# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 2, 2001

## ARTHUR L. RAWLINGS, JR. v. THE JOHN HANCOCK MUTUAL LIFE INS. CO., ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 99C-2393     Carol Soloman, Judge**

---

**No. M2000-03191-COA-R3-CV - Filed November 2, 2001**

---

This appeal involves a dispute between a decedent's estranged husband and brother over the proceeds of a $12,000 life insurance policy. When he discovered that his deceased wife had removed him as the beneficiary of her policy, the husband filed suit in the Circuit Court for Davidson County seeking to invalidate the change of beneficiary form. Following a bench trial, the trial court found that the decedent lacked the capacity to change the beneficiary on her life insurance policy and that the decedent's brother had procured the change through undue influence. Accordingly, the trial court awarded the decedent's husband the proceeds of her life insurance policy as well as $350 that his brother-in-law had removed from a joint account using a power of attorney he obtained from the decedent. We have determined that the evidence does not support the trial court's conclusion that the decedent lacked capacity to change the beneficiary of her life insurance policy and that the decedent's husband never asserted an undue influence claim in the trial court. Accordingly, we reverse the judgment and remand the case with directions to award the proceeds of the life insurance policy to the decedent's brother.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed and Remanded**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Alan C. Housholder, Nashville, Tennessee, for the intervenor appellant, Darden Holt.

Larry L. Roberts and Audrey Lee Anderson, Nashville, Tennessee, for the appellee, Arthur L. Rawlings, Jr.

## OPINION

### I.

Arthur Rawlings and Eleanor Rawlings were married in February 1946. Throughout most of their marriage, Mr. Rawlings worked for Genesco, and Ms. Rawlings worked for the Nashville Electric Service. This dispute revolves around a $12,000 life insurance policy Ms. Rawlings

obtained in 1961 through her employer. She originally named Mr. Rawlings as the sole beneficiary of this policy.

Ms. Rawlings was an alcoholic and struggled with her addiction throughout her adult life. She was finally forced to retire from the Nashville Electric Service, and in 1984 she broke her hip while inebriated. Diagnostic x-rays of this injury revealed twenty-seven other fractures from previous falls. Ms. Rawlings did not recover from this injury; she was discharged from the hospital to the first of several nursing homes where she spent the rest of her life.

One year later, Ms. Rawlings's mother died. With Ms. Rawlings confined to a nursing home, Mr. Rawlings served as the executor of his mother-in-law's will. During the probate proceeding, a dispute arose with Darden Holt, Ms. Rawlings's brother who lived in Texas. Mr. Holt eventually successfully contested the will. This dispute left Ms. Rawlings quite angry with Mr. Holt. While Ms. Rawlings and Mr. Holt continued to communicate, their relationship became strained. Ms. Rawlings disinherited Mr. Holt in her 1988 will specifically because of the will contest. Thereafter, Ms. Rawlings and Mr. Holt reconciled, and Mr. Holt visited his sister two or three times a year between 1988 and 1998.

Ms. Rawlings was admitted to the Bordeaux Hospital in May 1994. Mr. Rawlings continued to visit her there three to four times per week except when the weather limited his ability to travel. Ms. Rawlings's mental acuity began to slip as the years went on, and in November 1997 she was diagnosed with senile dementia and depression. She went through periods of confusion, and she was uncommunicative much of the time. By August 1998, Ms. Rawlings's world consisted only of her room at the Bordeaux Hospital. Her severe arthritis restricted her mobility. She was unable to get out of bed, turn over, or bathe and groom herself without assistance. She was on occasion able to feed herself, but usually she required assistance for this activity as well.

In August 1998, Mr. Rawlings told Ms. Rawlings that he wanted a divorce. This news upset Ms. Rawlings. During one of Mr. Holt's visits in October 1998, Ms. Rawlings told him about Mr. Rawlings's plans to divorce her and asked for his help. Mr. Holt agreed to help and began visiting his sister more frequently. In November 1998, Ms. Rawlings, with her brother's assistance, took several steps to separate herself from Mr. Rawlings. On November 9, 1998, she told the nursing staff that she desired legal assistance in the divorce proceeding and that she desired to change the address where her social security checks were being delivered. On November 11, 1998, Ms. Rawlings gave Mr. Holt her power of attorney. The following day, Mr. Holt used the power of attorney to change the address where her pension checks were being sent, and Ms. Rawlings signed a change of beneficiary form naming Mr. Holt as the beneficiary on her life insurance policy. Finally, on November 23, 1998, Ms. Rawlings executed a new will naming Mr. Holt as her executor and the sole beneficiary of her estate. Thereafter, Mr. Holt returned to his home in Texas, but not before making arrangements to forward all of Ms. Rawlings's mail to him and using the power of attorney to withdraw $350 from a joint account Ms. Rawlings maintained with Mr. Rawlings.

Mr. Rawlings continued to visit Ms. Rawlings even after he told her he wanted a divorce. Eventually, they agreed to an uncontested divorce, but Ms. Rawlings insisted that Mr. Holt review and approve the marital dissolution agreement. Mr. Rawlings had not filed for divorce by the time Ms. Rawlings died on July 20, 1999. Soon after Ms. Rawlings's death, Mr. Rawlings contacted the

John Hancock Life Insurance Company to obtain the proceeds of Ms. Rawlings's life insurance policy. Only then did he learn that he was no longer the named beneficiary of Ms. Rawlings's life insurance policy.

In August 1999, Mr. Rawlings filed suit in the Circuit Court for Davidson County against the John Hancock Life Insurance Company and the Nashville Electric Service seeking the $12,000 proceeds from Ms. Rawlings's life insurance policy on two grounds – that Ms. Rawlings was not competent in November 1998 to change the beneficiary on her life insurance policy and that the change had been procured by fraud. Mr. Holt intervened in the suit to defend his sister's action. All parties other than Messrs. Rawlings and Holt were dismissed after the death benefits from the insurance policy were paid into court. Following a bench trial, the trial court determined that Ms. Rawlings lacked the mental capacity in November 1998 to change the beneficiary on her life insurance policy or to execute a power of attorney and that Mr. Holt had exerted undue influence over her to obtain these two documents. Accordingly, on November 30, 2000, the trial court filed a memorandum and order awarding the $12,000 death benefit to Mr. Rawlings and directing Mr. Holt to return the $350 he had removed from the Rawlings' joint account in November 1998. The trial court also awarded Mr. Rawlings $1,557.50 in discretionary costs. Mr. Holt has appealed.

## II.
### THE STANDARD OF REVIEW

We turn first to the proper standards of review for the issues presented in this appeal. Because this is an appeal from a decision made by the trial court itself following a bench trial, the now familiar standard in Tenn. R. App. P. 13(d) governs our review. This rule contains different standards for reviewing a trial court's decisions regarding factual questions and legal questions.

With regard to a trial court's findings of fact, we will review the record de novo and will presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, if the trial judge has not made a specific finding of fact on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000); *Taylor v. Trans Aero Corp.*, 924 S.W.2d 109, 112 (Tenn. Ct. App. 1995). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992) (holding that an appellate court is bound to respect a trial court's findings if it cannot determine that the evidence preponderates otherwise). Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.

The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001); *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998); *Hicks v. Cox*, 978 S.W.2d 544, 547 (Tenn. Ct. App. 1998)*; McCormick v. Aabakus, Inc.*, ___ S.W.3d ___, ___, 2000 WL 1473915, at *1 (Tenn. Sp. Workers Comp. Panel 2000).

### III.
### MS. RAWLINGS'S MENTAL CAPACITY

Mr. Holt first asserts that the evidence does not support the trial court's conclusion that Ms. Rawlings lacked the mental capacity in November 1998 to give him her general power of attorney or to execute a form to change the beneficiary of her life insurance policy. He asserts that Mr. Rawlings failed to present evidence establishing that in November 1998, Ms. Rawlings lacked the ability to understand the nature and probable consequences of her actions. We agree.

### A.

The question of Ms. Rawlings's mental capacity depends upon the nature of the activities in which she was engaged. Transactions at issue in this case are (1) her execution of a general power of attorney on November 11, 1998 and (2) her execution of a change of beneficiary form on November 12, 1998. Because both of these transactions are essentially contractual in nature,[1] we will employ the standards commonly used to determine whether a person possesses mental capacity to contract.

The degree of mental capacity required to enter into a contract is a question of law. *Nashville, Chattanooga & St. Louis R.R. v. Brundige*, 114 Tenn. 31, 34, 84 S.W. 805, 805 (1905). Competency to contract does not require an ability to act with judgment and discretion. *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991). All that is required is that the contracting party reasonably knew and understood the nature, extent, character, and effect of the transaction. *Mays v. Prewett*, 98 Tenn. 474, 478, 40 S.W. 483, 484-85 (1897); *In re Estate of Holmes*, No. 02A01-9707-PB-00158, 1998 WL 134333, at *3 (Tenn. Ct. App. Mar. 26, 1998) (No Tenn. R. App. P. 11 application filed); *Roberts v. Roberts*, 827 S.W.2d 788, 791-92 (Tenn. Ct. App. 1991). Thus, persons will be excused from their contractual obligations on the ground of incompetency only when (1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or

---

[1]Changing a beneficiary on a life insurance contract affects an amendment to the existing contract and is itself the making of a new contract. *Moore v. New York Life Ins. Co.*, 146 S.E.2d 492, 498 (N.C. 1966). Accordingly, changing a beneficiary requires the same mental capacity as executing a valid contract. *Union Nat'l Bank v. Mayberry*, 533 P.2d 1303, 1307 (Kan. 1975); *Lynn v. Magness*, 62 A.2d 604, 607 (Md. 1949); Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 60:70 (3d ed. CD-ROM 2001). By the same token, a power of attorney establishes an agency relationship by agreement. Thus, to have an agency relationship under a power of attorney, the principal must have the capacity to contract. *Testa v. Roberts*, 542 N.E.2d 654, 658 (Ohio Ct. App. 1988); *In re Thames*, 544 S.E.2d 854, 856-57 (S.C. 2001).

(2) when they are unable to act in a reasonable manner in relation to the transaction, and the other party has reason to know of their condition.  Restatement (Second) of Contracts § 15(1) (1981).

All adults are presumed to be competent enough to enter into contracts.  *Uckele v. Jewett*, 642 A.2d 119, 122 (D.C. 1994); *Foltz v. Wert*, 2 N.E. 950, 953 (Ind. 1885).  Accordingly, persons seeking to invalidate a contract for mental incapacity have the burden of proving that one or both of the contracting parties were mentally incompetent when the contract was formed.  *Knight v. Lancaster*, 988 S.W.2d 172, 177-78 (Tenn. Ct. App. 1998); *Williamson v. Upchurch*, 768 S.W.2d 265, 269 (Tenn. Ct. App. 1988).  It is not enough to prove that a person was depressed[2] or had senile dementia.[3]  To prove mental incapacity, the person with the burden of proof must establish, in light of all the surrounding facts and circumstances,[4] that the cognitive impairment or disease rendered the contracting party incompetent to engage in the transaction at issue according to the standards set forth above.  *Butler v. Harrison*, 578 A.2d 1098, 1101 (D.C. 1990); *Weakley v. Weakley*, 198 S.W.2d 699, 702-03 (Mo. 1947); *see also Woods v. Mutual of Omaha*, No. 02A01-9510-CV-00218, 1996 WL 578489, at *3 (Tenn. Ct. App. Oct. 9, 1996), *perm. app. denied* (Tenn. 1997) (rejecting an affidavit that did not address the party's competency regarding the specific contract at issue).

**B.**

Mr. Rawlings's evidence regarding Ms. Rawlings's mental capacity in mid-November 1998 consisted of six witnesses.  Mr. Rawlings, his sister, and his lawyer's secretary testified at trial. Mr. Rawlings also presented the depositions of three physicians who had some contact with Ms. Rawlings at Bordeaux Hospital.  The testimony of these witnesses does little to substantiate Mr. Rawlings's claim that Ms. Rawlings lacked the mental capacity to execute a power of attorney or a change of beneficiary form.

We turn first to the testimony of the three physicians.[5]  All of them agree that Ms. Rawlings was depressed and that she had been prescribed the antidepressant Prozac to address this condition. Dr. Sator testified that Ms. Rawlings was taking the smallest possible dose of Prozac in November 1998 and that this medication did not impair Ms. Rawlings's competence.

Drs. Janes and Cochran also diagnosed Ms. Rawlings with dementia.  While they explained the nature of this condition, neither of them were able to state how Ms. Rawlings's dementia would

---

[2]*Forman v. Brown*, 944 P.2d 559, 562 (Colo. Ct. App. 1996); *Juliani v. Juliani*, 531 N.Y.S.2d 322, 325 (App. Div. 1988); *Drewry v. Drewry*, 383 S.E.2d 12, 16 (Va. Ct. App. 1980); *DiPietro v. DiPietro*, 460 N.E.2d 657, 664 (Ohio Ct. App. 1983).

[3]*Hanks v. McNeil Coal Corp.*, 168 P.2d 256, 260 (Colo. 1946); *Street v. Waddell*, 3 S.W.3d 504, 505-06 (Tenn. Ct. App. 1999) (holding that evidence of dementia alone does not prove lack of testamentary capacity).

[4]*Roberts v. Roberts*, 827 S.W.2d at 792.

[5]Dr. Daisey B. Sator was Ms. Rawlings's attending physician from May 1994 to June 1999.  Dr. Cynthia Janes is a consulting psychiatrist who briefly interviewed Ms. Rawlings on three occasions between May and October 1998. Dr. Michele Cochran is also a consulting psychiatrist who briefly interviewed Ms. Rawlings on two occasions in March 1999.

have affected her mental capacity in mid-November 1998. Dr. Cochran candidly stated that she knew nothing about Ms. Rawlings's condition in November 1998 and speculated that Ms. Rawlings might have had pseudodementia, a condition brought on by depression that resolves itself as the depression clears. Dr. Janes also observed that dementia and competency are "somewhat different things" and that she could not offer an opinion regarding Ms. Rawlings's competency in mid-November 1998. Dr. Sator, the physician with the most sustained medical relationship with Ms. Rawlings, stated unequivocally that Ms. Rawlings was competent in November 1998.

Mr. Rawlings's remaining evidence is as unpersuasive as his medical evidence. Peggy Howell, a secretary employed by Mr. Rawlings's lawyer, testified that she had not seen Ms. Rawlings since February 1988 when she witnessed Ms. Rawlings sign her will. Mr. Rawlings's sister testified that Ms. Rawlings became "a little confused" approximately eighteen months before she died and that Ms. Rawlings "never really talked too much." Mr. Rawlings observed that Ms. Rawlings began going "in and out" in 1997 and that she became less communicative.

The record is not devoid of evidence establishing Ms. Rawlings's competency in mid-November 1998. In addition to Dr. Sator's testimony, David Lampley, the hospital's Advocacy Risk Management Director, testified he was present on November 17, 1998, when Ms. Rawlings signed her durable power of attorney for health care and that at that time, Ms. Rawlings was oriented to "person, time, place, and situation" and that she was "aware of what she was doing." The persons who witnessed Ms. Rawlings execute her will on November 23, 1998, executed an affidavit attached to the will stating that Ms. Rawlings "declared to them that . . . [the will] was her Last Will and Testament," that "she wanted each of us to sign it as a witness," and that she was "of sound mind" at the time.[6]

After reviewing the evidence surrounding Ms. Rawlings's circumstances in mid-November 1998, we have concluded that Mr. Rawlings failed to prove that Ms. Rawlings did not reasonably understand the nature and consequences of the transactions she engaged in on November 11 and 12, 1998. Nor has he proved that Ms. Rawlings was unable to act in a reasonable manner with regard to these transactions. Accordingly, we find that the evidence preponderates against the trial court's conclusion that Ms. Rawlings lacked the mental capacity to execute her durable power of attorney or the change of beneficiary form. It therefore follows that the trial court's findings regarding Ms. Rawlings's competency are reversed.

## IV.
### MR. HOLT'S UNDUE INFLUENCE

---

[6]Mr. Rawlings did not appear to be overly concerned about Ms. Rawlings's mental competency between August 1998 and February 1999. He must have thought she was competent enough to negotiate the terms of their marital dissolution agreement because he permitted his lawyer to talk with her about the matter. In a February 22, 1999 letter Mr. Rawlings's lawyer informed Mr. Holt that he had spoken to Ms. Rawlings "a couple of weeks ago." He also requested Mr. Holt to approve a marital dissolution agreement that vested the marital homeplace in Mr. Rawlings rather than selling the property and dividing the proceeds. The reasons given for not dividing this asset equally were: "Considering Mrs. Rawlings' [sic] condition, it makes little sense to require that the property be sold and the proceeds divided. Any proceeds received by Mrs. Rawlings would necessarily go to the government for her support. Accordingly, it just makes sense to vest that property together with the household goods in Mr. Rawlings. Of course, any personal effects which Mrs. Rawlings might want should be distributed to her and to members of her family."

-6-

Mr. Holt also takes issue with the trial court's conclusion that his sister "did not have the capacity to resist the pressure and undue influence that her brother placed on her." First, he argues that the trial court erred by basing its decision on undue influence grounds because Mr. Rawlings had neither pled nor proved an undue influence claim. Second, he asserts that, even if Mr. Rawlings had properly claimed undue influence, the evidence preponderates against the trial court's conclusion. We agree with Mr. Holt's argument that Mr. Rawlings's amended complaint does not contain a claim that he had exerted undue influence to obtain Ms. Rawlings's power of attorney or her signature on the change of beneficiary form.

## A.

Mr. Rawlings's theory about the change of beneficiary form is found in one paragraph of his original complaint. Before he became aware of the circumstances surrounding Ms. Rawlings's execution of the change of beneficiary form, he alleged that

> said beneficiary was fraudulently changed without Mrs. Rawlings [sic] consent and/or permission, when Mrs. Rawlings was incompetent, and/or with a forged power of attorney executed by someone other than Mrs. Rawlings or while she was incompetent.

Thereafter, Mr. Holt filed an intervening complaint setting out how Ms. Rawlings had executed the change of beneficiary form. In his response to Mr. Holt's intervening complaint, Mr. Rawlings alleged that Mr. Holt "began to operate in his sister's behalf through an attorney, based upon a forged power of attorney, to obtain property to which he had no legal right, including the insurance proceeds in question in the instant case."

As the litigation continued, Mr. Rawlings filed two amended and substituted complaints. Rather than including a specific undue influence allegation in these complaints, he left the allegations in his original complaint unchanged. Thus, this case went to trial based Mr. Rawlings's claims that the beneficiary of Ms. Rawlings's life insurance policy had been "fraudulently changed" either because Ms. Rawlings was incompetent or because the change was accomplished "with a forged power of attorney executed by someone other than Mrs. Rawlings."

The bulk of the evidence introduced at trial related to Ms. Rawlings's competence. The transcript contains no specific mention of undue influence, although Mr. Holt was examined and cross-examined about the circumstances surrounding Ms. Rawlings's execution of her power of attorney and the change of beneficiary form. The first direct reference to "undue influence" appears in the trial court's memorandum and order. After concluding that Ms. Rawlings lacked the mental capacity to execute the power of attorney and the change of beneficiary form, the trial court added: "Further this court finds that Mrs. Rawling's [sic] mental health had deteriorated to such a point that she was severely depressed and she was easily manipulated. Essentially, she did not have the capacity to resist the pressure and undue influence that her brother placed upon her."

## B.

The pleadings required by the Tennessee Rules of Civil Procedure provide the vehicle for identifying and refining the matters at issue in a lawsuit. They provide the parties and the trial court with notice of the claims and defenses involved in the case. *Poster v. Andrews*, 182 Tenn. 671, 677, 189 S.W.2d 580, 582 (1943); *Hammett v. Vogue, Inc.*, 179 Tenn. 284, 290, 165 S.W.2d 577, 579 (1942). Thus, even under today's relaxed rules of pleading, it is necessary to include enough facts in a complaint to articulate a claim for relief. *Jasper Engine & Transmission Exchange v. Mills*, 911 S.W.2d 719, 720 (Tenn. Ct. App. 1995).

The failure to assert a claim or defense in a timely manner is deemed a waiver of the right to rely on the claim or defense later in the proceeding. *Castelli v. Lien*, 910 S.W.2d 420, 429 (Tenn. Ct. App. 1995). Thus, unless the unpled claim has been tried by consent in the trial court,[7] it cannot provide a basis for a judgment in favor of the claimant. *Fidelity-Phenix Fire Ins. Co. v. Jackson*, 181 Tenn. 453, 463, 181 S.W.2d 625, 629 (1944); *Roddy v. Volunteer Med. Clinic, Inc.*, 926 S.W.2d 572, 576-77 (Tenn. Ct. App. 1996); *John J. Heirigs Constr. Co. v. Exide Corp.*, 709 S.W.2d 604, 607 (Tenn. Ct. App. 1986). Similarly, an unpled claim cannot be asserted for the first time on appeal. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Davis v. Tennessee Dep't of Employment Sec.*, 23 S.W.3d 304, 310 (Tenn. Ct. App. 1999); *Cobble v. McCamey*, 790 S.W.2d 279, 283 (Tenn. Ct. App. 1989).

The courts should avoid construing pleadings in any artificially technical sense. Thus, they should give the language of a pleading its fair and natural construction, *Farmers State Bank v. Jones*, 34 Tenn. App. 57, 69, 232 S.W.2d 658, 663 (1950), and they should give effect to the substance of a pleading rather than its form. *Fann v. City of Fairview*, 905 S.W.2d 167, 175 n.14 (Tenn. Ct. App. 1994); *Brown v. City of Manchester*, 722 S.W.2d 394, 397 (Tenn. Ct. App. 1986). However, the courts must stop short of reading a claim into a pleading where none exists. *Donaldson v. Donaldson*, 557 S.W.2d 60, 62 (Tenn. 1997); *Rampy v. IPI Acrylics, Inc.*, 898 S.W.2d 196, 198 (Tenn. Ct. App. 1994).

## C.

The pivotal issue with regard to the trial court's undue influence conclusion is whether Mr. Rawlings's amended complaint includes an undue influence claim. If this claim exists, it can only be embodied in the allegations that the "beneficiary was fraudulently changed without Mrs. Rawlings' [sic] consent" or that the beneficiary was changed "with a forged power of attorney executed by someone other than Mrs. Rawlings." We conclude that these allegations do not make out an undue influence claim.[8]

---

[7] Tenn. R. Civ. P. 15.02; *BVT Lebanon Shopping Ctr. v. Wal-Mart*, 48 S.W.3d 132, 135 n.2 (Tenn. 2001); *In re Adoption of E.N.R.*, 42 S.W.3d 26, 30 n.1 (Tenn. 2001); *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 890-91 (Tenn. 1980).

[8] This case does not require us to determine whether an undue influence claim must comply with the particularity requirements in Tenn. R. Civ. P. 9.02. While other courts have held that undue influence claims need not be plead with particularity, *Gosa v. Willis*, 341 So.2d 699, 701 (Ala. 1977); *Nelson v. Covington*, 519 A.2d 177, 179 (D.C. 1986); *Skelton v. Skelton*, 308 S.E.2d 838, 841 n.2 (Ga. 1983), we are addressing a more fundamental issue here. We must decide whether Mr. Rawlings's amended complaint contains any language at all that can be fairly construed

(continued...)

Fraud and undue influence are two conceptually different theories. *Nelson v. Covington*, 519 A.2d at 179; Joseph Warren, *Fraud, Undue Influence, and Mistake in Wills*, 41 Harv. L. Rev. 309, 326-27 (1928). The basic ingredient of a fraud claim is deception. Fraud is a trick or artifice or other use of false information that induces a person to dispose of his or her property in a way he or she would not otherwise have done but for the fraud. 1 William J. Bowe & Douglas H. Parker, *Page on the Law of Wills* § 14.3, at 695 (1960). Fraud does not override a person's free agency or free will. It induces a person to exercise his or her free will mistakenly based on false information. *Union Planters Nat'l Bank v. Inman*, 588 S.W.2d 757, 761-62 (Tenn. Ct. App. 1979).

Undue influence, on the other hand, consists of exerting enough influence or pressure to break down a person's will power and to overcome a person's free agency or free will so that the person is unable to keep from doing what he or she would not otherwise have done. *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993); *Hollis v. Thomas*, 42 Tenn. App. 407, 423, 303 S.W.2d 751, 758 (1957). Simply attempting to influence another person's decision regarding the disposition of his or her property in not undue influence. *Kelly v. Allen*, 558 S.W.2d 845, 847 (Tenn. 1977); *Keasler v. Estate of Keasler*, 973 S.W.2d 213, 219 (Tenn. Ct. App. 1997); *Parham v. Walker*, 568 S.W.2d 622, 624 (Tenn. Ct. App. 1978). To amount to undue influence, the persuasion or influence must cause a person to act contrary to his or her duty and inclination. *Hager v. Hager*, 13 Tenn. App. 23, 30 (1930).

Mr. Rawlings's amended complaint articulates claims based on lack of mental capacity and fraud. It alleges that the beneficiary of Ms. Rawlings's life insurance was changed at a time when she was incompetent and that the beneficiary of Ms. Rawlings's life insurance policy was changed without her consent using a forged power of attorney executed by someone other than Ms. Rawlings. However, even giving the complaint a most liberal reading, it does not allege that Mr. Holt exerted such undue influence over Ms. Rawlings that he was able to induce her to dispose of the proceeds of her life insurance policy in a way that she would not otherwise have done. Accordingly, we conclude that Mr. Rawlings's amended complaint does not contain an undue influence claim.

We also conclude that the parties did not try an undue influence claim by consent. The transcript fails to reflect that "undue influence" was ever mentioned during the trial itself. There is likewise no indication that Mr. Rawlings moved to conform the pleadings to the proof in accordance with Tenn. R. Civ. P. 15.02. In the absence of an undue influence claim in Mr. Rawlings's amended complaint or any proof regarding undue influence at trial, the trial court erred by basing its decision, even in part, upon its conclusion that Mr. Holt unduly influenced Ms. Rawlings to change the beneficiary of her life insurance policy.[9]

---

[8](...continued)
as an undue influence claim.

[9]We would reach the same result if we addressed the substance of the trial court's undue influence determination. Even if Mr. Rawlings succeeded in shifting the burden of going forward to Mr. Holt, we find that the record contains clear and convincing evidence that Ms. Rawlings's decision to change the beneficiary of her life insurance policy was entirely her own. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995) (holding that the presumption of undue influence may be rebutted by clear and convincing evidence of the fairness of the transaction). Ms. Rawlings's decision came approximately three months after Mr. Rawlings told her that he wanted a divorce after
(continued...)

## V.

We reverse the judgment and remand the case to the trial court for the entry of an order awarding the proceeds of Ms. Rawlings's life insurance policy to Mr. Holt. Because Mr. Rawlings is no longer the prevailing party, we vacate the portion of the order awarding him discretionary costs under Tenn. R. Civ. P. 54.04(2). We also tax the costs of this appeal to Arthur L. Rawlings, Jr. for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[9](...continued)
fifty-two years of marriage. The only person Ms. Rawlings could turn to for help was her only surviving blood relative, Mr. Holt. Mr. Holt agreed to assist her. Accordingly, it not remarkable that Ms. Rawlings, facing the grim prospect of being left alone in a nursing home for the rest of her days, decided to transfer her remaining assets to her brother who had agreed to help her in her most desperate hour. This is especially the case in light of Mr. Rawlings's efforts to convince Ms. Rawlings to give him the marital home rather than selling the home and using half of the proceeds for her medical care.