IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 1, 2024 Session[1]

## JAMES A. WELCH ET AL. V. OAKTREE HEALTH AND REHABILITATION CENTER LLC D/B/A CHRISTIAN CARE CENTERS OF MEMPHIS ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-000544-18  Jerry Stokes, Judge**

_____

**No. W2020-00917-COA-R3-CV**

_____

At issue in this appeal is whether an individual, now deceased, lacked the requisite mental capacity when he signed a durable power of attorney for health care. The trial court answered this question in the affirmative, specifically concluding that there was clear and convincing evidence that the decedent was incompetent. As a result of this determination, the trial court further concluded that an arbitration agreement later signed by the decedent's brother using the power of attorney was invalid, a conclusion which in turn prompted the trial court to deny the Defendants' motion to compel arbitration on the basis of that agreement. For the reasons stated herein, we affirm the order of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Craig C. Conley, Quinn N. Carlson, and W. Preston Battle IV, Memphis, Tennessee, and Christy Tosh Crider, Nashville, Tennessee, for the appellants, Oaktree Health and Rehabilitation Center LLC, Care Centers Management Consulting, Inc., and Christian Care Center of Memphis, LLC.

Cameron C. Jehl, Carey L. Acerra, Deena K. Arnold, and Eric H. Espey, Memphis, Tennessee, for the appellee, James A. Welch, Next of Kin and Administrator ad Litem of Estate of David Neil Welch, deceased, and on behalf of the wrongful death beneficiaries of David Neil Welch.

_____

[1] Oral argument in this case was heard at the University of Memphis Cecil C. Humphreys School of Law on February 1, 2024.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

This is not the first occasion we have reviewed this case, and in fact, our present review stems from a reversal and remand by the Tennessee Supreme Court. *See Welch v. Oaktree Health & Rehab. Ctr. LLC*, 674 S.W.3d 881, 899 (Tenn. 2023) (reversing our ruling on one issue and remanding for our consideration of another). To revisit the general facts and background of the case and further frame the nature of our present task on remand, we begin this Opinion by liberally citing to, and quoting from, our Supreme Court's prior decision.

David Welch ("David"), who is the decedent in this case, was the brother of James Welch ("James"), the administrator of David's estate.[2] *Id.* at 884. David was diagnosed with Down syndrome shortly after his birth, and he could not read and had difficulty understanding and following instructions. *Id.* He had no formal education, and James described him as having "the mind of a two-year-old." *Id.*

Over a decade ago, in 2012, David needed cataract surgery, and James helped him to obtain care. *Id.* Of particular note, this episode culminated in the execution of a durable power of attorney for health care ("POA"). As specifically relayed by our Supreme Court:

> The physician scheduled to perform the surgery required James to get a health care power of attorney for David. James printed out an online durable power of attorney for health care . . . form and filled it out, listing James as David's health care agent and giving James authority to make David's health care decisions. At James's direction, David "scratched his name" on the signature line on the last page. The POA also had the signatures of two witnesses who declared under penalty of perjury that the principal, David, was known to them, signed or acknowledged the document in their presence, and "appears to be of sound mind and under no duress, fraud or undue influence."

*Id.* James used the POA for David's eye surgery, and thereafter, he continued to use it for other health care providers for David. *Id.* James was never appointed as a guardian or conservator for David, and he was also never appointed as David's health care agent or surrogate by any physician. *Id.*

In November 2016, James sought to admit David to Oaktree Health and

---

[2] Because David Welch and James Welch share a last name, we, like the Supreme Court did in its decision, use their first names herein to avoid any confusion. No disrespect, of course, is intended.

Rehabilitation Center LLC, d/b/a Christian Care Center of Memphis ("Christian Care"), a residential nursing home facility. *Id.* Christian Care was aware of David's Down syndrome diagnosis, and as part of the admission process, James, acting on David's behalf, executed several documents for him. *Id.* at 884-85. Among the included documents was an arbitration agreement ("Arbitration Agreement"). *Id.* at 885. It is undisputed that execution of the Arbitration Agreement was not mandatory; indeed, David would have been admitted to Christian Care even if James had declined to sign it. *Id.*

> As our Supreme Court further outlined when discussing the Arbitration Agreement: The Arbitration Agreement lists Christian Care as the "Facility," David Welch as the "Resident," and James Welch as the "Representative." James signed it and filled out his "Relationship to Resident" as "Brother [and] POA." The Arbitration Agreement states it "waives Resident's right to a trial in court and a trial by a jury for any future legal claims resident may have against facility."
>
> The Arbitration Agreement required the representative of the resident to provide Christian Care with a copy of "the document creating the agency or guardianship." Both parties agree that James would have shown the POA form to Christian Care in the admission process.

*Id.*

Although David lived at Christian Care for several months, he was transferred to Saint Francis Hospital on April 10, 2017. *Id.* Four days later, David died at the age of 62. *Id.* Following David's passing, on February 7, 2018, James sued Christian Care and a number of related entities (collectively, "the Defendants") in the Shelby County Circuit Court ("the trial court"). *Id.* The suit was brought in James's capacity as the administrator of David's estate, and the filed complaint, which includes a demand for a jury trial, alleges, among other things, a claim for wrongful death. *Id.*

In chronicling the ensuing activity that occurred in the trial court prior to this Court's initial review of the case, our Supreme Court noted as follows:

> In response [to the complaint], the Defendants filed a motion to compel arbitration based on the Arbitration Agreement. The trial court let the parties engage in discovery related to arbitration.
>
> In response to the motion to compel arbitration, Plaintiff asserted that James had no authority to sign the Arbitration Agreement because David did not have the mental capacity to appoint an agent when David executed the POA. In support, Plaintiff submitted David's medical records, as well as an expert affidavit and deposition testimony.

In reply, Defendants argued that the trial court could not look beyond the face of the POA to consider evidence of David's mental capacity. They based this argument on Tennessee Code Annotated section 34-6-208, the immunity provision in Tennessee's Durable Power of Attorney for Health Care Act, as well as a footnote in this Court's opinion in *Owens v. National Health Corporation*, 263 S.W.3d 876 (Tenn. 2007). In the alternative, Defendants argued that the evidence on David's lack of mental capacity was not clear and convincing.

The trial court entered an order stating that it would consider evidence on whether David had the mental capacity to execute the POA. After doing so, it entered a second order denying the motion to compel arbitration. The trial court found by clear and convincing evidence that David lacked the requisite mental capacity to execute the POA. As a result, the POA was invalid, and James did not have authority to execute the Arbitration Agreement on David's behalf.

*Id.* at 885-86 (internal footnotes omitted).

As our Supreme Court discussed, when the matter was subsequently appealed to this Court by the Defendants, we reversed the trial court regarding its decision to look beyond the face of the POA to determine whether David had the mental capacity to execute it. *Id.* at 886. Although this, in turn, caused us to pretermit examination into a raised issue on appeal regarding whether there was, in fact, clear and convincing evidence that David lacked the required capacity to execute the POA, we ultimately directed that the case be remanded for the trial court to consider an alternative argument James had raised in the trial court that had yet to be addressed: whether the Arbitration Agreement is unconscionable. *Id.* at 885 n.4, 886-87.

James thereafter sought permission to appeal to our Supreme Court and argued that this Court had erred in holding that the trial court could not consider evidence pertaining to David's lack of mental capacity in connection with the POA's execution. *Id.* at 887. Our Supreme Court granted permission to appeal and later held as follows in connection with its review of the case: "[W]e reverse the Court of Appeals' ruling that the trial court in this case erred in considering evidence on the circumstances surrounding execution of the durable power of attorney for health care and whether the principal lacked the requisite mental capacity to sign the document." *Id.* at 887, 899. Upon observing that this Court's holding, however, had pretermitted examination into the issue of whether the trial court had erred in finding there was clear and convincing evidence that David lacked the requisite mental capacity when he signed the POA, the Supreme Court concluded its review by remanding the case back to this Court "for consideration of whether the trial court erred in finding clear and convincing evidence that David lacked the requisite mental capacity when he signed the durable power of attorney for health care, and any other issues raised on

- 4 -

appeal not pretermitted by our holding in this opinion." *Id.* at 899. In light of this disposition and these instructions from our Supreme Court, we now turn to addressing the issue of David's mental capacity incident to his execution of the POA. A specific overview of the evidence that is relevant to an examination of this issue is interwoven below in connection with our included analysis and discussion.

## STANDARD OF REVIEW

The issue before us is connected to the trial court's denial of the Defendants' motion to compel arbitration, and the record reflects that the trial court's decision involved its reliance on documentary evidence. As is relevant to our review under such circumstances, we observe that this Court has previously noted as follows:

> This court reviews the denial of a motion to compel arbitration under the same standards applicable to bench trials. Therefore, the trial court's findings of fact are reviewed "*de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Generally speaking, when findings of fact are based on the credibility of witnesses, appellate courts must give considerable deference to the trial court's findings based on live testimony, as it had the opportunity to see and hear the witnesses. However, the trial court in this case did not rely on live witnesses but rather made findings of fact based on documentary evidence only. In such a case, appellate courts need not give similar deference to such findings, but instead an "appellate court may make an independent assessment of credibility of documentary proof it reviews, without affording deference to the trial court's findings." Additionally, the trial court's conclusions of law are also reviewed *de novo* with no presumption of correctness given.

*Farmer v. S. Parkway Assocs., L.P.*, No. W2012-02322-COA-R3-CV, 2013 WL 5424653, at *4 (Tenn. Ct. App. Sept. 25, 2013) (internal citations to case law omitted).

## DISCUSSION

As a result of the directions from our Supreme Court, we are presently tasked with addressing the Defendants' raised concern that the trial court erred in finding clear and convincing evidence that David lacked the requisite mental capacity when he signed the POA.[3] With respect to the question of a party's mental capacity, Tennessee law provides

---

[3] We observe that after the oral argument in this Court that occurred on remand from the Supreme Court, the Supreme Court held in a separate case that "entering an optional arbitration agreement with a health care facility is not a 'health care decision' within the meaning of the Durable Power of Attorney for Health Care Act." *Williams v. Smyrna Residential, LLC*, --- S.W.3d ----, ----, 2024 WL 655014, at *14 (Tenn. Feb. 16, 2024); *see also id.* at ----, 2024 WL 655014, at *19 (Lee, J., dissenting) ("Under today's

that "[t]he degree of mental capacity required to enter into a contract[4] is a question of law," *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001), whereas "whether a party possessed the required degree is a question of fact." *Duke v. Kindred Healthcare Operating, Inc.*, No. W2010-01534-COA-R3-CV, 2011 WL 864321, at *7 (Tenn. Ct. App. Mar. 14, 2011). Capacity itself "is not an abstract, all-or-nothing proposition." *In re Conservatorship of Groves*, 109 S.W.3d 317, 333 (Tenn. Ct. App. 2003). Rather, capacity "involves a person's actual ability to engage in a particular activity." *Id.* The concept is "task-specific," *id.*, and "[a] person may be incapacitated with regard to one task or activity while retaining capacity in other areas because the skills necessary in one situation may differ from those required in another." *Id.* at 333-34.

Adults are presumed to be competent enough to enter into contracts, and persons seeking to invalidate a contract for mental incapacity must prove that one or both of the contracting parties were mentally incompetent when the contract was formed. *Rawlings*, 78 S.W.3d at 297. The requisite proof must be "clear, cogent, and convincing in order to set the contract aside." *Duke*, 2011 WL 864321, at *7. In order to have the capacity to contract, the contracting party must reasonably know and understand "the nature, extent, character, and effect of the transaction." *Rawlings*, 78 S.W.3d at 297. Persons will be excused from contractual obligations on the ground of incompetency when: "(1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) when they are unable to act in a reasonable manner in relation to the transaction, and the other party has reason to know of their condition." *Id.* Ultimately, the person with the burden of proof regarding the issue of mental incapacity "must establish, in light of all the surrounding facts and circumstances, that the cognitive impairment or disease rendered the contracting party incompetent to engage in the transaction at issue . . . ." *Id.* (internal footnote omitted).

Having reviewed the record transmitted to us on appeal, we agree with the trial court that there is clear and convincing evidence that David was "incompetent, and unable to . . . appreciate the gravity of signing the [POA]" and that he suffered from diminished

---

decision, it appears an individual acting on behalf of another person during the health care admission process must have a health care power of attorney to execute the admission agreement that contains the arbitration agreement *and* a general durable power of attorney to execute the arbitration agreement contained in the admission agreement."). James has not attempted to separately raise an issue in this appeal that the POA, being a health care power of attorney, was insufficient to confer him authority to sign the Arbitration Agreement due to the subject matter of the POA and the Arbitration Agreement's non-mandatory nature, and in any event, as discussed herein based on our consideration of the specific issue tasked for our review from the instructions of the Supreme Court, we are able to affirm the trial court's denial of the Defendants' motion to compel arbitration due to our agreement that the evidence is clear and convincing that David lacked the requisite capacity to execute the POA.

[4] In this case, the document in question is a power of attorney. "[A] power of attorney establishes an agency relationship. . . . [T]o have an agency relationship under a power of attorney, the principal must have the capacity to contract." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 n.1 (Tenn. Ct. App. 2001).

cognition that prevented him from appreciating the effect of the POA. In pertinent part, we note the evidence offered by James through his deposition, as well as the expert testimony offered through licensed physician Dr. A. Jefferson Lesesne ("Dr. Lesesne") by way of affidavit and deposition, regarding David's lifetime history with Down syndrome and associated cognitive impairment.

As mentioned in the Supreme Court's prior opinion in this matter, *see Welch*, 674 S.W.3d at 884, and as testified to by James, David could not read and had no formal education. According to James's testimony, David also "didn't have the ability to learn." James further characterized David as "[v]ery similar" to "a two-year-old in an 18-year-old body." David's cognitive ability simply "wasn't there," and James indicated that this was true throughout David's life, stating as follows on the subject: "Whether it was upon admission to Christian Care or any time prior to that during his life, his cognitive ability was very, very, very not existent." According to James, David could not write, save for writing his name, although, as discussed below, the record actually contains evidence of multiple instances where David misspelled either his first or middle name.

James's testimony reflected that, before living at Christian Care, David had lived with their parents and, after leaving the care of their parents, at The Baddour Center, which the record indicates is a residential home located in Senatobia, Mississippi for adults with disabilities who cannot live alone.[5] As the trial court would later note, "David . . . lived at The Baddour Center for twenty-eight (28) years . . . ." The trial court was presented with detailed records from The Baddour Center, and these records evidence multiple instances of misconduct on the part of David that are generally corroborative of James's likening of his brother to a young child. For instance, in a number of records created in the months leading up to the signing of the POA, David is depicted as fighting with others and refusing to follow instructions.

To be sure, The Baddour Center records also contain several positive entries regarding instances of good behavior on David's part, and they also reflect, as the Defendants have emphasized, that David was able to perform certain tasks. That David was able to perform certain tasks at The Baddour Center, such as washing dishes, did not dissuade James's expert, Dr. Lesesne, from concluding that David was incompetent with regard to the transaction at issue here. Indeed, when asked whether the competency required to appreciate the POA is a different level of understanding than the understanding it would take for somebody to wash a set of dishes, Dr. Lesesne responded, "Absolutely there's a difference."

During his testimony, Dr. Lesesne distinguished between "basic" and "instrumental" activities of daily living. Concerning basic activities of daily living, which involve

---

[5] James's testimony reflected that David had been admitted to the hospital immediately before his subsequent admission to Christian Care.

activities such as ambulation and toileting, Dr. Lesesne testified that David was "moderate." When asked for his assessment in relation to instrumental activities of daily living, which Dr. Lesesne noted involved activities like "[s]hopping, you know, managing your affairs, those kind of things," Dr. Lesesne testified as follows: "I don't think -- you know, I don't think you could say, hey, David here's 50 bucks and a shopping list and come back out with these 25 items." Whereas certain records from The Baddour Center indicated that David had been involved in cooking meals, an activity which Dr. Lesesne indicated may be considered an instrumental activity depending on what is cooked, and other records indicated that David had been involved in cleaning, an activity which Dr. Lesesne noted was instrumental, Dr. Lesesne also stated the following: "David didn't do any of these things independently. He was supervised in nearly every instance." When subsequently stressing this fact in relation to a subsequent question asked of him, Dr. Lesesne testified as follows:

> [A]gain, he was supervised. I mean, I think any of these -- you could have a ten-year-old child standing next to one of their parents, potentially cooking and/or putting up groceries or washing dishes or anything like that. That's not the context with which you decide whether somebody is independent in their IADLs or not.

Dr. Lesesne, who had reviewed multiple records concerning David,[6] including The Baddour Center records, noted in his affidavit that the impairments and limitations associated with Down syndrome were indicated "throughout the entirety of the records" he had reviewed. In pertinent part, he attested that the records from The Baddour Center indicated that David "exhibited clear indications of impairments, limitations, and behaviors" consistent with Down syndrome throughout David's residency and also that David "had a history of limited cognitive and mental capabilities." David was, according to Dr. Lesesne, "on the lower end of the [Down syndrome] spectrum in terms of somewhere between total care and needing . . . virtually 24-hour supervision."[7] When testifying about

---

[6] Dr. Lesesne did not personally meet with David in this case as David was deceased. In addition to reviewing various records concerning David, Dr. Lesesne reviewed certain depositions, including James's. Although Dr. Lesesne candidly acknowledged that an in-person assessment is "always better," he testified that it was not inappropriate for a person reviewing medical records to make a determination about prior cognitive abilities of someone who was deceased, stating as follows: "[I]t doesn't mean it's not held as valid." Dr. Lesesne testified that, in the past, he had also done other competency evaluations based on medical records.

[7] We note that, during a hearing before the trial court, defense counsel represented that Dr. Lesesne "was unable to testify or determine where [David] was on that spectrum." The trial court interjected soon thereafter, stating, "Let me stop you just a moment[.] . . . Didn't he indicate that he thought it was his opinion that [David] was operating or functioning on the low spectrum of functionality and cognition? I thought I saw that." Defense counsel stated that it was his "recollection that [Dr. Lesesne] was unable to offer any opinions as to exactly where on the Down syndrome spectrum . . . [David] could be placed," but also added, "I stand to be corrected by the record or [James's counsel] or whomever else." James's counsel then read from the testimony where Dr. Lesesne had stated that David had been on the "lower end" of the

- 8 -

The Baddour Center records, Dr. Lesesne stated that "most of those behavior records . . . indicated somebody who was very childlike in their behavior with both the staff and other residents," leading him to conclude that David did not really have much competency "for any high-level understanding of anything, whether it was medical conditions, financial conditions, anything of that sort." In his affidavit, Dr. Lesesne stated that The Baddour Center records showed that David had "continuous poor oral hygiene and needed constant reminders to brush and floss his teeth, as well as wear his compression boots at night for his Lymphedema." Further, Dr. Lesesne observed that David "would eat excessive amounts of food to the point of making himself sick, and at times, vomiting." In the view of Dr. Lesesne, "[r]eminding an adult, like [David], about the importance of brushing and flossing his teeth, wearing compression boots at night to prevent leg pain and swelling, and the need to eat slowly and not in excess to avoid abdominal pain, nasusea, and/or diarrhea is demonstrative of a person . . . who is unable to understand in a reasonable manner the nature and consequences of his/her actions." In a similar vein, whereas Dr. Lesesne acknowledged that David had the ability to report complaints to health care providers, he testified that the types of complaints David made were of a "rudimentary" nature and that the records suggested David had the inability to know what to do about a problem as basic as dry skin that was cracked. In any event, Dr. Lesesne noted that the competency at issue here was in relation to the POA, which he stated involved something "different . . . than saying, hey, my skin is cracking or my feet hurt." Continuing on, he testified as follows: "A person who's deemed incompetent for some of these higher-order things can . . . make certain complaints known." This testimony, like much of the testimony Dr. Lesesne offered, was certainly in accord with the principle we highlighted earlier, i.e., that capacity is not an all-or-nothing proposition but is instead a "task-specific" concept. *In re Conservatorship of Groves*, 109 S.W.3d at 333.

As for David's ability to write his name, Dr. Lesesne observed that multiple records indicated that David could not always write or spell his name correctly. When discussing this in his deposition, Dr. Lesesne noted that this had even occurred when David's name was spelled correctly on the top of the same document. According to Dr. Lesesne, this proof concerning misspellings was "a piece of evidence that goes into the stack to tell you that he, you know, is not coherent enough most of the time to correctly write his name repeatedly." Although Dr. Lesesne acknowledged that David had spelled his name correctly on the POA, this did not alter Dr. Lesesne's ultimate conclusion regarding his competency. Pointing to the fact that he found significance in David's failure to consistently spell his name the same way, Dr. Lesesne noted as follows: "[T]here's probably six variations. Maybe one of them is right. But there's six variations of it. So that is -- it's in totality that I'm saying -- that is further credence around his abilities both

---

Down syndrome spectrum, following which defense counsel replied as follows: "Yes. Thanks for correcting me on that . . . ." Curiously, on appeal, the Defendants again submit through their briefing that Dr. Lesesne failed to offer an opinion as to where David fell on the Down syndrome spectrum. Clearly, this is not the case.

cognitively and otherwise to understand what's going on."

James testified that he did not think David was able to understand, in a reasonable manner, the nature and consequences of signing the POA, and according to him, it was not accurate to say that David had appointed him as health care power of attorney.[8]  In explaining this, and when discussing the context in which the POA was signed incident to David's need for eye surgery, James noted that doctors had indicated that he would have to have David's medical power of attorney in order to get the eye procedure scheduled and done.  He thus testified that he had taken it upon himself to go online and print out the POA form and then have David scratch his name on the page.  David, he said, "had absolutely no concept of what this was all about."

According to James's recollection, any time he was asked for a power of attorney in relation to David, he would respond, "I don't know whether it's valid or not, but, nonetheless, I have it."  This was also the case concerning the admission process at Christian Care, during which, per James's testimony, he had informed the Christian Care representative that he was not sure whether the POA was valid.  James stated that this was because he did not believe David had been competent to execute the POA.  Carol Reeves, who had served as a marketing and admissions coordinator at Christian Care, testified that, if James had a specific memory concerning the admissions meeting, she would not have a basis to dispute it.

Just as James had testified that he did not think David could understand the nature and consequences of the POA, Dr. Lesesne attested in his affidavit that it was his opinion, "to a reasonable degree of medical certainty, that David . . . was not able to understand and appreciate the nature, scope, effect, and implications of power of attorney documents *during his adult life*, including the [POA]." (emphasis added)  Further, he attested that it was his specific opinion, to a reasonable degree of medical certainty, that David "was not competent to execute, read, and understand the [POA]."  In his subsequent deposition testimony, he specifically stated that he had "no belief that [David] had any understanding or concept," while also adding, "I don't think there's any question in my mind that David didn't -- that David had any concept of what it meant to sign this thing."  Dr. Lesesne did not think David could understand the nature of the POA in a reasonable manner and also testified that he had not seen anything, whether before or after the execution of the POA, that would suggest David had the ability to understand and appreciate the consequences of it.

It is evident through Dr. Lesesne's testimony that his conclusion regarding David's incompetency in relation to the POA was not the product of any particular fact alone.  Explaining the scope of his review, he stated as follows:

_____

[8] In fact, according to James, David had never even told him that he could make medical or financial decisions for him.

- 10 -

Again, none of this is simply one thing or another.  It's -- I'm taking all this in totality and reviewing his behavior, the circumstances around the care he was given, some of his more elementary behaviors, and concluding that I don't think he was competent to make higher-level decisions.  So it's not any one thing.

Just as Dr. Lesesne looked at this matter in its "totality," our review herein has taken into account all of the facts and circumstances of the case based on the record transmitted to us on appeal, and as signaled earlier, it is based on that record, in particular the evidence adduced by way of Dr. Lesesne and James, and through David's various records, that we agree with the trial court's conclusion that the evidence is clear and convincing that David was not competent to execute the POA.  Undoubtedly, David was able to perform certain tasks during his tenure at the The Baddour Center, and as the trial court found, there is no question that he "could engage in some basic living functions" there.  Again, though, capacity is not an all-or-nothing proposition but is instead a "task-specific" concept, *id.*, and here, all the facts and circumstances of the case being considered, the evidence clearly paints a picture in our view that David did not have the mental capacity to reasonably know and understand the nature, extent, character, and effect of signing the POA.  As such, we agree with the trial court that the POA was not valid, and given our conclusion on this matter, we hereby affirm the trial court's order denying the Defendants' motion to compel arbitration.  Indeed, as the trial court noted, "[b]ecause there was no valid power of attorney granting James . . . the authority to execute Defendants' Arbitration Agreement on [David's] behalf, there is no valid agreement to arbitrate this matter . . . [.]"

In connection with our decision in this appeal, we expressly decline an alternative suggestion from the Defendants that we "should remand the case to the trial court for additional expert discovery before deciding to strip David of his ability to contract."  The Defendants' request to this end is, respectfully, an unduly belated one.  Although the Defendants maintain that they were previously litigating this case under the premise that the trial court should not look beyond the four corners of the POA, the Defendants were clearly aware that the trial court *was* inquiring into the question of David's competency.  Indeed, the trial court expressly ruled as such in January 2020, and yet in the face of this ruling and despite thereafter deposing James's expert, Dr. Lesesne, there is no indication in the record that the Defendants ever attempted to pursue developing proof by way of their own competing expert.  Moreover, the Defendants did not even attempt to raise this desire for "additional expert discovery" as an alternative issue in their principal briefing in this Court.  The request was only pursued in supplemental briefing submitted after the remand from our Supreme Court.  In light of these circumstances, we consider the desire for additional expert discovery to be waived. *See Smith v. Hauck*, 469 S.W.3d 564, 576 (Tenn. Ct. App. 2015) ("It is well-settled that issues not raised in the trial court may not be presented for the first time on appeal."); *see also Jones v. Jones*, No. M2022-00624-COA-R3-CV, 2023 WL 4559880, at *7 (Tenn. Ct. App. July 17, 2023) (concluding that an issue was waived when, among other things, the "argument was not raised in [the party's] initial

- 11 -

appellate brief").

## CONCLUSION

In light of the foregoing discussion, we affirm the trial court's denial of the Defendants' motion to compel arbitration and remand the case for such further proceedings that are necessary and consistent with this Opinion.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE
