L. A. HENSON *et ux. v.* J. A. HENSON *et al.*\*

(*Nashville.* December Term, 1924.)

1. **BILLS AND NOTES.** Cancellation of note does not have to be in writing.

Under Negotiable Instruments Act, section 119, relating to methods of discharging negotiable instrument, cancellation of note need not be in writing, regardless of section 122, providing that it may be discharged by renunciation in writing. (*Post, pp.* 145-147.)

Acts cited and construed: Acts 1899, ch. 94, 119, 122.

Cases cited and approved: Hall v. Wichita State Bank & Trust Co., 254 S. W., 1036; Scott v. Bank, 123 Tenn., 278; McEwen v. Troost, 1 Sneed, 186.

Cases cited and distinguished: Lockhart State Bank v. Baker, 264 S. W., 568; Trowell v. Carraway, 57 Tenn., 104; Marshall v. Russell, 93 Tenn., 261; Weaver v. Weaver, 182 Ill., 287.

2. **GIFTS.** Administrator of payee who had notes destroyed intending to forgive debt cannot recover on them.

In view of Shannon's Code, section 5694, relating to action on lost instruments, where payee of notes intentionally had them destroyed intending to forgive debt evidenced thereby, his administrator cannot recover thereon. (*Post, p.* 148.)

Cases cited and approved: District of Columbia v. Cornell, 130 U. S., 655; Booth v. Smith, 3 Fed. Cas., 889; Sullivan v. Shea, 32 Cal. App., 369; Ross & Co. v. Walker, 44 Fla., 704; Conner v. Martin, 46 Ind. App., 141; Darland v. Taylor, 52 Iowa, 503; Denunzio v. Scholtz, 117 Ky., 182; Blake v. Kearney, Man. Unrep. Cas. (La.), 320; Montgomery v. Schwald, 177 Mo. App., 75; Vanauken v. Hornbeck, 14 N. J. Law, 178; Gardner v. Gardner, 22 Wend., 526; Kester v. Kester, 38 Or., 10; Licey v. Licey, 7 Pa., 251; Templeton v. Butler, 117 Wis., 455; Scholey v. Ramsbottom, 2 Campbell (Eng.), 485.

Code cited and construed: Sec. 5694(S.).

3. **PRINCIPAL AND AGENT.** .One may do through agent what he can do himself.

What part can lawfully do himself, he can do through agent. (*Post*, *p.* 149.)

4. **BILLS AND NOTES.** Destruction of instrument constitutes cancellation.

Destruction of instrument constitutes cancellation. (*Post, p.* 149.)

5. **LIENS.** Extinguishment of debt discharges lien securing it.

Extinguishment of debt *ipso facto* discharges lien to secure it. (*Post.* *p.* 149.)

*Headnotes 1. Accord and Satisfaction, 1 C. J., Section 46; Bills and Notes, 8 C. J., Section 849; 2. Gifts, 28 C. J., Section 67; 3. Agency, 2 C. J., Section 24; 4. Bills and Notes, 8 C. J., Section 854; 5. Liens, 37 C. J., Section 53.

FROM SEQUATCHIE.

Appeal from the Chancery Court of Sequatchie County. Hon. T. L. Stewart, Chancellor.

Brown & Spurlock and Stewart & Pope, for complainants.

Spears & Spears, for defendants.

Mr. Justice McKinney delivered the opinion of the Court.

The question for decision is this: Where the testator purposely destroys a note by burning it, does it operate to discharge the debt?

The bill alleges that on the 21st day of September, 1915, the complainants purchased of W. R. Henson, the father of the complainant, L. A. Henson, several tracts of land in Sequatchie county, and on said day said W. R. Henson executed a deed conveying said lands to complainants. A copy of said deed is exhibited with the bill, in which the description of the lands are given.

The bill further alleges that the consideration for said conveyance was $2,500, $500 of which was to be paid without interest twelve months from the date of the deed, which was evidenced by a note, and five notes for $400 each were executed payable in two, three, four, five, and six years, respectively, from date; that a lien was retained on the land to secure the payment of the principal and interest on the notes; that the first note was paid to W. R. Henson during his lifetime; that W. R. Henson died intestate in February, 1920; that a short time before his death W. R. Henson declared to members of his family, and to others, his intention of forgiving the complainants the indebtedness represented by said notes; that, in order to carry out this intention, he directed Mrs. Lula Henson, wife of the defendant J. A. Henson, to burn said notes, which she did; and that said W. R. Henson made no other or further claim on complainants because he had forgiven said indebtedness.

The prayer of the bill was for a decree declaring a release, discharge, and forgiveness of said indebtedness freeing and relieving the land of any lien by reason of the execution of said notes.

The answer admits the execution of the deed and notes as set out in the bill, and contains the following recitals:

"It is true that these notes were owned by W. R. Henson and that they were retained in his possession. It is also true that a short time before his death he said to J. A. Henson and his wife, Lula Henson, that he did not intend to collect these notes, but still retained these notes in his possession on up until just before his death.

"After that some time, and on a different occasion, he said to Lula Henson and J. A. Henson that he did not intend to collect the notes unless he should need them for his support and maintenance, and in the absence of J. A. Henson, these respondents are informed that he ordered Lula Henson, or directed her to burn up these notes, which she did."

The answer further alleges: "These respondents are advised that this action of W. R. Henson in burning these notes did not in law release the complainant and his wife from the payment of the notes. Such action was not binding upon W. R. Henson, and that if he were alive to-day, he could sue and collect these notes."

The answer was also filed as a cross-bill, and sought a recovery against complainants upon said notes and to have said lands sold to satisfy the decree.

Answer was duly made to the cross-bill, in which the allegations of the original bill were reiterated.

The chancellor dismissed the original bill and sustained the cross-bill.

Upon appeal the court of civil appeals reversed the chancellor, sustained the original bill, dismissed the cross-bill, and the defendants have appealed and assigned numerous errors.

Only two parties testified in the case. They were introduced by complainants, and testified as follows:

"Lula Henson, wife of defendant J. A. Henson, testified that she was acquainted with W. R. Henson in his lifetime, and that W. R. Henson died some time in February, 1920, or about that time. That some years before his death he lived in the home of the witness and her husband. That he conveyed to L. A. Henson and his wife a tract of land for which Henson and his wife executed notes for the purchase money. That about one year before he died, and while he was still at the home of the witness, W. R. Henson declared his purpose to release these notes, and directed the witness to get the notes and destroy them and thereby release the said Henson of any balance due on said tract of land. The witness did not destroy the notes on this occasion, but about six or seven months after this, and about five or six months before the death of the said W. R. Henson, he brought the subject up again, and W. R. Henson again directed the witness to get the notes and destroy them, and thereupon the said witness did get the notes that were then in the possession of W. R. Henson and burned them up. This was done at the request of the said Henson. The said Henson had often expressed a desire to give the property to L. A. Henson and said he did not expect these notes to be collected.

"Charles D. Cain testified that he was personally acquainted with W. R. Henson for many years, being a neighbor, and talked with him frequently in regard to his business. On one occasion, about six months before his death, in talking to him about his business, he referred to certain notes executed by his son, L. A. Henson, for land, and said if he needed the proceeds of said

notes to support him during his lifetime, he expected to realize on them, but that he might not live long, and in the event of his death he did not want these notes collected; that he expected to give his son these notes. The reason given for this was that his son was a man not in good health, and besides he had lived with him a great number of years after he had attained his majority, and had helped to make the money to help him out of his financial difficulties. Mr. Henson made it very plain to the witness that he did not expect these notes to be collected in the event of his death before they were collected.''

1. Counsel for defendants insist that a cancellation or discharge of a debt must be in writing in order to be effective, and base their insistence upon section 122 of the Negotiable Instruments Act (Laws 1899, chapter 94), which is as follows:

''The holder may expressly renounce his rights against any party to the instrument, before, at, or after its maturity. An absolute and unconditional renunciation of his rights against the principal debtor, made at or after the maturity of the instrument, discharges the instrument. But a renunciation does not affect the rights of a holder in due course without notice. A renunciation must be in writing, unless the instrument is delivered up to the persons primarily liable thereon.''

Upon the other hand, it is insisted by counsel for complainants that a cancellation or discharge, such as that appearing in the instant cause, does not have to be in writing, and they rely upon section 119 of the Negotiable Instruments Act, which is as follows:

"A negotiable instrument is discharged:

"(1)   By payment in due course, by or on behalf of the principal debtor;

"(2)   By payment in due course, by the party accommodated, where the instrument is made or accepted for accommodation;

"(3)   By the intentional cancellation thereof by the holder;

"(4)   By any other act which will discharge a simple contract for the payment of money;

"(5)   When the principal debtor becomes the holder of the instrument at or after maturity in his own right."

When the two sections above quoted are construed together, it is apparent that they are neither inconsistent nor in conflict.   Section 119 provides five acts which constitute a discharge.   Section 122 provides that a note may (also) be discharged by renunciation provided the renunciation is in writing.   In the first section the legislature did not see proper to require that the discharge be in writing, while in the other section it did.   It is unnecessary to discuss the reason for this distinction.

In *Lockhart State Bank* v. *Baker,* (Tex. Civ. App.), 264 S. W., 568, this question was involved, and the court, in its opinion, said:

"The question, therefore, is whether subdivision 4, section 119, Negotiable Instruments Act (article 6001—119), providing that a negotiable instrument may be dis-charged by any act which would discharge a simple contract for the payment of money, is limited or controlled by article 6001—122, relating to discharge of such instrument by express renunciation, and requiring it to

be in writing. Appellant's contention has been recently decided adversely to it in the case of *Hall* v. *Wichita State Bank & Trust Co.,* 254 S. W., 1036, in a well-considered opinion by the Amarillo court of civil appeals, and in which a writ of error was refused by the supreme court November 12, 1923. We quote the following from this opinion:

" 'From what has been said it seems apparent to us that it was the intention of the lawmakers by section 122 to deal with the formal and express release of the common law, and by the provisions of section 119, par. 4, to continue in effect other recognized methods of discharging obligations of this character. An express release is not necessary to a discharge by novation. The intention or agreement to accept the new obligation in lieu and discharge of the old may be implied.'

"The method of discharging the note in suit in the Hall-Bank Case, supra, was by novation; while the discharge of the note in suit in the case at bar was by accord and satisfaction, and by equitable estoppel, or estoppel *in pais.* These methods of discharging simple contracts were recognized by the common-law and equity courts, and we are clear in the view that it was not the intention of the legislature to preclude these defenses by enacting article 6001—122, supra. It is evident that it was the intention of the legislature to incorporate in this article of the statute the common-law rules as announced by the text-writers and adjudicated cases of both England and America, which declared that a contract might be released by a formal instrument for that purpose without the necessity of showing a considera-

tion therefor; or upon payment of a less consideration than provided in the contract and a surrender to the debtor of the instrument evidencing the contract for cancellation; such was considered in law equivalent to a release in writing. See 1 C. J., 543, section 46, notes 8, 9 and 10, and cases there cited. We have not examined all the cases cited by this authority, but find those examined support the text and the rule above announced.

"It is also clear to our minds that it was the intention of the legislature, in enacting article 6001—119, and the various subdivisions, supra, to incorporate in the statutory law other methods of discharging negotiable instruments, which had theretofore been declared by the common law to discharge a simple contract. Neither of these sections relate to, limit, or control the other, but relate to and control separate and entirely distinct matters: We therefore do not sustain appellant's contention that it was the intention of the legislature in enacting section 122, supra, to cover all character of discharge of negotiable instruments, and to preclude thereafter proof of any character of discharge by oral testimony."

We are of the opinion, therefore, that a cancellation of a note does not have to be in writing.

Counsel for the defendants further insist that, in order to make a gift valid, there must be either an actual, a constructive, or a symbolic delivery of the thing given, and it is insisted that the facts of this cause do not show such a delivery, and they refer to three decisions of this court, to which we will advert briefly.

The first is *McEwen* v. *Troost,* 1 Sneed, 186, in which a deed of gift to personal property was executed by Dr.

151 Tenn.—10.

Troost to two of his children, and same was duly recorded. Dr. Troost remained in possession of the property until his death ten years later. The evidence failed to show actual delivery of either the deed or the property. The court sustained the validity of the gift.

The second is *Trowell* v. *Carraway,* 10 Heisk., 104; the facts and the holding of the court being contained in the syllabus, which is as follows:

"A., being a man of wealth, advanced in years, and childless, took into his family an infant, B., two or three years of age, and treated him for nearly twenty years as his adopted son. A. loaned money and took notes payable to B., or payable to himself and endorsed by him to B., keeping possession of them, collecting and reinvesting during B.'s minority, and often spoke of them as B.'s property. During the war he delivered them to B., with some of his own notes, to conceal. Afterward A. became angry with B. and forbade him his house. A. made a will making no mention of the notes, then amounting to about $15,000, but they were, after his death, found by his executor in A.'s closet, where B., as he told the executor, had placed them. . . .

"Gift to B. complete and irrevocable, and the notes did not pass to the residuary legatee."

The third is *Marshall* v. *Russell,* 93 Tenn., 261, 25 S. W., 1070, in which the syllabus fairly outlines the case, and is as follows:

"Marshall went to Shown's office and handed him a note case containing a batch of notes aggregating about $12,000, stating that he had given them to his wife, and that he desired Shown, who was an attorney, to collect

or renew them in the name and for the benefit of the wife. Shown accepted the trust. After Marshall had left Shown's room, but before he had retired from the building, he returned and obtained one of the notes, for $1,000, and immediately took and presented it to another person (Brumley), stating his reasons for making the gift. . . .

"The court cannot affirm that the delivery of the $1,000 note to Shown was not inadvertent, and therefore the subsequent gift to Brumley is valid."

It is apparent that none of these cases involve the question under consideration.

In *Scott v. Bank,* 123 Tenn., 278, 130 S. W., 763, a gift *causa mortis* was sustained where there was no manual or actual delivery. In that case this court quoted approvingly from *Weaver* v. *Weaver,* 182 Ill., 287, 55 N. E., 338, 74 Am. St. Rep., 173, as follows:

"The usual mode of delivery is the manual transfer from the grantor to the grantee. But it is too well understood to call for the citation of authorities that the declarations and conduct of the grantor in relation to the instrument may be such as to become equivalent to such actual delivery, and in every such case the crucial test is the intent with which the acts or declarations are made, and that intent is to be ascertained from the conduct of the parties, particularly the grantor, and all the surrounding circumstances of the transaction."

None of the decisions of this court deal directly with the question here involved, viz., the voluntary destruction of the notes by the payee.

After examining all the authorities accessible, we find that the cases uniformly hold that the destruction by the donor of the evidence of the indebtedness with the intention to make a gift to the debtor is a sufficient forgiveness of the debt. 28 Corpus Juris, 667; 12 Ruling Case Law, 944; Pomeroy's Equity Jurisprudence (3d & 4th Ed.), section 1148; *District of Columbia* v. *Cornell,* 130 U. S., 655, 9 S. Ct., 694, 32 L. Ed., 1041; *Booth* v. *Smith,* 3 Fed. Cas., 889, No. 1,649; *Sullivan* v. *Shea,* 32 Cal. App., 369; 162 P., 925; *Ross & Co.* v. *Walker,* 44 Fla., 704, 32 So., 934; *Conner* v. *Martin,* 46 Ind. App., 141, 92 N. E., 3; *Darland* v. *Taylor,* 52 Iowa, 503, 3 N. W., 510, 35 Am. Rep., 285; *Denunzio* v. *Scholtz,* 117 Ky., 182, 77 S. W., 715, 4 Am. Cas., 529; *Blake* v. *Kearney,* Man. Unrep. Cas. (La.), 320; *Montgomery* v. *Schwald,* 177 Mo. App., 75, 166 S. W., 831; *Vanauken* v. *Hornbeck,* 14 N. J. Law, 178, 25 Am. Dec., 509; *Gardner* v. *Gardner,* 22 Wend. (N. Y.), 526, 34 Am. Dec., 340; *Kester* v. *Kester,* 38 Or., 10, 62 P., 635; *Licey* v. *Licey,* 7 Pa., 251, 47 Am. Dec., 513; *Templeton* v. *Butler,* 177 Wis., 455, 94 N. W., 306; *Scholey* v. *Ramsbottom,* 2 Campbell (Eng.), 485.

Under the facts of this cause the deceased, if living, could not have maintained this suit.

Section 5694 of Shannon's Code provides that lost instruments may be supplied by affidavit stating that such instrument has been unintentionally lost or mislaid, and is still the property of the person claiming it, unpaid and unsatisfied.

The payee having intentionally destroyed the best evidence of the debt will not be permitted to establish

same by secondary evidence, and such is the holding in several of the cases cited above.

The administrator stands upon no higher ground than his intestate, and unquestionably the destruction of the notes by intestate's daughter-in-law, in the circumstances, was equivalent to his destruction of them. What a party can lawfully do himself he can do through an agent.

3. Under the authorities the destruction of an instrument constitutes a cancellation. 8 Corpus Juris, 614; 3 Ruling Case Law, 1220; Webster's Unabridged Dictionary.

4. It is elementary that an extinguishment of the debt, *ipso facto,* discharges the lien to secure same.

We have carefully considered all of the assignments of error made by the defendant and find them without merit.

It results that the decree of the court of civil appeals will be affirmed, with costs.