IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
MAY 22, 2007 Session

## IN RE: THE ESTATE OF WILLIAM REYNOLDS, JR., DECEASED

## RANDAL REYNOLDS, Administrator of the Estate of William Reynolds, Jr.
## v. FREDDIE VOLNER, ET AL.

**Direct Appeal from the Chancery Court for Gibson County (Trenton)**
No. 17223P    George R. Ellis, Chancellor

_____

**No. W2006-01076-COA-R3-CV - Filed September 11, 2007**

_____

This appeal involves a sale of equipment, made by a decedent to his friend, eleven days before he died. The administrator of the decedent's estate filed a complaint to set aside the sale alleging fraud, undue influence, and inadequate consideration. Following a bench trial, the trial court set aside the sale and ordered the estate to reimburse the purchase money to the buyers. We reverse.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Vacated**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., joined and HOLLY M. KIRBY, J., dissented.

Sam J. Watridge, Humboldt, TN, for Appellant

Jeffrey A. Smith, Trenton, TN, for Appellees

**OPINION**

### I.    FACTS & PROCEDURAL HISTORY

William Reynolds, Jr., now deceased, earned his living drilling water wells, installing septic tanks, and doing dozer work. On September 17, 2004, Mr. Reynolds conveyed twenty items of equipment, including a bulldozer, a backhoe, trucks, trailers, and tools, to Fred and Juanita Volner. Mr. Volner was in the business of transporting and setting up mobile homes, and he and Mr. Reynolds sometimes worked together on jobsites. Mr. Volner and Mr. Reynolds had been friends for at least thirty years, and Mr. Volner regularly drove Mr. Reynolds to a clinic where they both received chelation (blood cleansing) therapy.

The parties executed the bill of sale in the office of a shop owned by Mr. Volner. The bill of sale stated that the equipment was being conveyed to the Volners "for value received." It specifically listed all the equipment by model and VIN number, where applicable, and the document was notarized and signed by two additional witnesses. Mr. Reynolds also gave Mr. Volner a stack of titles for various items of the equipment.

Mr. Reynolds died intestate on September 28, 2004, at the age of 70, from terminal cancer. He was survived by his wife, Robin Reynolds, and two adult sons, Ricky and Randal Reynolds. Mr. Reynolds had just recently married his wife, on September 7, 2004, but they had also been married and divorced in the past, and they worked together drilling wells. Randal Reynolds filed a petition in the Chancery Court of Gibson County seeking to be appointed to administer his father's estate. He estimated that the estate consisted of $200,000 in real property and $100,000 in personalty. Randal Reynolds was appointed Administrator of the estate on October 29, 2004.

On March 22, 2005, Randal Reynolds, as Administrator, filed a complaint asking the court to set aside the sale to the Volners on the bases of inadequate consideration, fraud, and undue influence. He also amended his original petition to reflect that, due to the equipment sale, the remaining personal property of the estate was worth only $5000. The court conducted a bench trial on March 28, 2006.

Mr. Volner testified about the events leading up to the equipment sale and the consideration that supported the sale. He explained that, in the year before Mr. Reynolds's death, he had borrowed Mr. Reynolds's dozer and expressed his interest in buying the dozer. They apparently discussed the sale for a few months, with Mr. Reynolds attempting to persuade Mr. Volner to buy all of his equipment. During that time, Mr. Volner "loaned" Mr. Reynolds $9000 on one occasion, and $1000 on another occasion. According to Mr. Volner, these loans were made with the intent that he would eventually buy the dozer. Mr. Volner testified that both loans were made in cash, and he did not receive any type of receipt from Mr. Reynolds. However, he offered to show a cashier's check to prove that he was paid $10,000 by a construction company that produced the $9000 in cash.

Mr. Volner also testified that he sold a certain piece of real property in order to pay Mr. Reynolds an additional $10,000 for the equipment. The property was sold to Tommy Estep, a mutual friend of Mr. Volner and Mr. Reynolds, who would sometimes ride with them to chelation treatments at the clinic. The testimony about the terms of this sale was somewhat contradictory. At his deposition, Mr. Volner stated that he sold the property to Mr. Estep two to three months before Mr. Reynolds died and gave Mr. Reynolds $10,000 in cash. At trial, Mr. Volner testified that Mr. Estep brought the $10,000 to his shop and presented it to Mr. Reynolds on the day that they signed the bill of sale for the equipment, which was eleven days before Mr. Reynolds died. The warranty deed presented for the land sale reflects that the sale took place on January 24, 2005, several months after Mr. Reynolds died. The deed also states that the consideration for the sale was only $10, but the consideration affidavit states that it was $2000. When asked about the discrepancies, Mr. Volner testified that Mr. Estep initially paid him $2000, and then gave him the rest of the money later. He also said that when Mr. Estep gave him the money, he had hoped to repay it soon after and that he

was "more or less putting the property up to stand good for it." When he was unable to repay Mr. Estep, he eventually transferred the deed to the property to him. Mr. Estep similarly testified that he brought the money to the shop on the day that Mr. Volner bought the equipment, after he obtained $8000 from a financing company. He also explained that Mr. Volner initially intended to buy the property back, but he was financially unable to do so.

In sum, Mr. Volner testified that he paid $20,000 to Mr. Reynolds for the equipment – $9000 and $1000 in loans, and $10,000 from the land sale.[1] Mr. Volner explained that $20,000 was all that he could afford to pay for the equipment. Mr. Volner readily admitted that he originally intended to buy only the dozer, but he claimed that Mr. Reynolds insisted that he buy all of the equipment in order to keep his business together. He said that Mr. Reynolds did not want to sell just the dozer. According to Mr. Volner, Mr. Reynolds worried about his wife having a problem with Xanax, and he feared that she would simply sell his equipment after he died. At some point, Mrs. Reynolds was also arrested and jailed because of methamphetamine-related charges. Mr. Reynolds allegedly asked Mr. Volner to try to help his wife and to allow her to continue operating the business if possible. Mr. Volner claimed that Mr. Reynolds's intention was to allow his wife to have a job but to prevent her from selling his equipment.

At trial, the owner of a farm equipment business testified regarding the values of the various pieces of equipment that were sold to the Volners. He estimated that the dozer was worth $20,000, and that the total value of the equipment sold was between $57,000 and $71,250.[2] He then explained that under the current economic conditions, the actual value of the equipment would be on the low end of that range. The trial judge later stated that a clerk had added up the individual values of the equipment discussed by the witness, and "the clerk came up with the top end figure of $79,550." The trial judge ultimately concluded that the equipment was worth $79,550.

Randal Reynolds, the Administrator, testified that his father was unable to read or write beyond signing his name and deciphering road signs. Mr. Volner testified that he did not actually see Mr. Reynolds sign the bill of sale, and that he did not know who prepared the bill of sale with the list of all the equipment to be sold. He stated that Mr. Reynolds presented the document with his signature already in place, and Mr. Reynolds acknowledged that he had signed it. Mr. Volner also testified that his sister notarized the bill of sale, and that although she was present and asked Mr. Reynolds about his signature on the document, she did not actually witness him signing it.

Randal Reynolds testified that Mr. Reynolds was taking morphine for pain in the days before his death. Regarding Mr. Reynolds's physical and mental condition, Randal Reynolds stated that:

---

[1] Randal Reynolds, the Administrator, testified that when he was collecting the assets of the estate, he only found $2000 in cash in a lockbox. When asked whether Mr. Reynolds paid off all of his debts before his death, the Administrator stated that Mr. Reynolds still owed money on a Ditchwitch and a trailer.

[2] The witness estimated that the Ditchwitch listed on the bill of sale was worth $3500. Apparently, a bank repossessed the Ditchwitch after Mr. Reynolds died because the VIN number on Mr. Volner's bill of sale did not match the VIN number on the Ditchwitch.

It was very poor. He couldn't hardly like keep attention, he was always head falling down, eyes closed even when you was talking to him. You know, it was – it wasn't a whole lot of attention span there and it wasn't a whole lot of hearing what you were telling him or nothing.

When asked whether Mr. Reynolds could carry on conversations, he replied:

Not every time. Sometimes, yes, sometimes like I said he would be asleep. His head would fall over and his eyes closed. He just – you know, some days was better than other days is all I can tell you. Some days yeah and some days no.

Mr. Reynolds's former stepdaughter also testified about his ability to communicate. She described his condition as follows:

Q. And was he able to understand what you were saying?

A. Most of the time not, really, he was in and out. He became so heavily medicated about a month that – I mean, you might think he understood you, but then next time he might not.
. . .

Q. All right. Two weeks before his death, what was his condition?

A. Oh, just oblivious to the world. He just, you know, he would look at me but it would be that – I mean and there might be times I might go that he did but most of the time he didn't. That just far away look whenever he – you hoped he knew you but not.

Q. Were there times when he did not know you?

A. Absolutely.

Q. Were there times when he didn't know his sons?

A. I think so. . . . And I went to sit with him and this was like two weeks and he was spitting at me, you know. And that as a child, a parent, and that's a hard, difficult time, but I knew he didn't know me. He didn't.

A former co-worker of Mr. Reynolds testified that he came to see Mr. Reynolds before he died, and that Mr. Reynolds did not seem to be in his "right mind" when they talked.

Mrs. Reynolds was also asked whether Mr. Reynolds's "mind was good" before he died, to which she responded:

My husband were [sic] a very sharp man. He was, you know, he took care of business wise and everyone knows that. They had conversations with him up until the day he died, the night he died and

he spoke just as plain as me and you are speaking. Did he have times and bouts in there when he was out of his head, absolutely. . . . But my husband was not crazy, he knew what he was doing. . . . And he done it well.

She also explained that Mr. Reynolds's hospice nurse became angry with her because she would not make Mr. Reynolds take his pain medication. Mrs. Reynolds said that Mr. Reynolds did not want to take medicine because he wanted to talk to people, and that she could not force him to take it.

Tommy Estep, who bought the land from Mr. Volner, testified about the day that the bill of sale was executed. He testified that there was nothing unusual about the transaction, and that he signed the bill of sale as a witness. He stated that Mr. Reynolds was in a wheelchair, but that he "had all his marbles" and was talking and "cutting up" just as he normally would. He also said that he had several previous discussions with Mr. Reynolds about his plan to sell the equipment because his health was getting bad and Mr. Reynolds "wanted to make sure that [his wife] was well took care of, if she worked and did everything right." Regarding the money that was transferred, Mr. Estep stated that he laid the money on the desk, the parties all counted it, and that Mr. Reynolds placed it in his pocket.

Another witness, Johnny Wilson, testified that he was also present at the shop on the day of the sale and that he had known both parties for years. He said that Mr. Reynolds simply asked him to sign as a witness for him on an equipment sale, and Mr. Reynolds told him that he had already signed the bill of sale. He stated that Mr. Reynolds appeared pale-looking, but he was alert.

Mr. David Harrison, another mutual friend of Mr. Reynolds and Mr. Volner, testified that he was present at the shop when the parties executed the bill of sale. He said that he heard Mr. Reynolds say that he had everything filled out already, and all that he needed to do was to get the Volners' signatures and to get some money. He testified that he saw Mr. and Mrs. Volner sign the bill of sale, and he saw "a bunch of hundred dollar bills" being transferred between the parties.

Mrs. Volner's son testified that he knew the parties had been talking about the equipment sale for some time before the bill of sale was executed. He also said that on the day of the sale, he saw Tommy Estep hand a "wad of money" to Mr. Reynolds, and he heard Mr. Reynolds say that he had already signed the bill of sale. Mrs. Volner's half-sister also testified that she saw Mr. Reynolds at the shop with some type of paper that he said he had signed. Finally, another witness testified that he was working at the shop that day and saw a man in a wheelchair in the office with Mr. Volner, who had an envelope and said he had papers ready to sign. The witness also said that he saw Tommy Estep put a "wad of bills" on the table.

At the conclusion of the testimony, the trial judge announced the following findings, which were later incorporated into his final order:

The Court finds that according to the testimony of Freddy Volner that the transaction in dispute was an attempt to grant a dying man's wish that his business remain intact after his death and that there was no intent to purchase the equipment. Two, further the Court finds that the transaction violated the statute of frauds, in addition to the testimony that the bill of sale was fraudulently signed by the witnesses and the Notary who did not witness William Reynolds, Jr. sign the instrument. Three, due to the unrefuted proof of the medical condition and medication of the deceased that such a transaction would violate the fiduciary relationship by a close friend purchasing $79,550 of equipment from a dying friend for $20,000, 11 days before he died.

The Court further finds that the equipment – the Court orders the equipment listed in Exhibit 4 [the bill of sale] shall be returned to the executor of the estate of Williams [sic] Reynolds Jr., and further the Court finds that a debt of $20,000 is owed by the estate of Williams [sic] Reynolds, Jr. to Freddy Volner and wife Juanita Volner.

In addition, the final order stated that the Court found that the medication Mr. Reynolds was taking before his death would have impaired his ability to contract. Randal Reynolds, as Administrator of the estate, filed a notice of appeal on May 15, 2006, challenging the trial court's order that the estate must repay the Volners $20,000.

## II.  ISSUES PRESENTED

The appellant has timely filed a notice of appeal and presents the following issue for review:

1.      Is the estate liable to pay the Volners $20,000 when there is no proof that a debt existed?

Additionally, the appellees present the following issue for review:

2.      Did the trial court err in holding that the conveyance of the listed equipment was fraudulent and should be set aside?

For the following reasons, we reverse the decision of the chancery court.

## III.  STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing

effect. ***Watson v. Watson***, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

Randal Reynolds, on behalf of the estate, challenged the equipment sale on the bases of inadequate consideration, fraud, and undue influence. We interpret the trial court's ruling as relying upon several alternative grounds for setting aside the sale – lack of intent and/or mutual assent, violation of the statute of frauds, undue influence, and incompetency to contract. We will address each of these issues first to determine if any one of the findings was a proper basis for setting aside the sale.

### A. Intent to Purchase

The trial court's first reason for setting aside the sale was that "according to the testimony of Freddy Volner that the transaction in dispute was an attempt to grant a dying man's wish that his business remain intact after his death and that there was no intent to purchase the equipment." The court apparently considered Mr. Volner's testimony about originally only wanting to buy the dozer and concluded that, at the time of the sale, he still did not intend to purchase the other equipment. On appeal, Mr. Volner asserts that he did intend to buy the equipment, and that he expressed his intentions by signing the bill of sale listing all of the items of equipment.

Although the cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the parties' intentions, when the language of a contract is plain and unambiguous, the court must determine their intentions from the four corners of the contract, interpreting and enforcing it as written. ***Int'l Flight Ctr. v. City of Murfreesboro***, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2000). Parol evidence is inadmissable to contradict or vary the terms of a written contract when the parties' intentions are readily ascertainable from the contract as reduced to writing. ***Gates, Duncan & Vancamp Co. v. Levatino***, 962 S.W.2d 21, 25 (Tenn. Ct. App. 1997) (citing *McQuiddy Printing Co. v. Hirsig*, 23 Tenn.App. 434, 134 S.W.2d 197, 204 (1939)). "The law conclusively presumes that the parties to a contract understood its obligations, and evidence is not admissible to show that their understanding was in fact otherwise." ***Id.***

We find that Mr. and Mrs. Volner manifested their intent to purchase all of the equipment by executing the bill of sale that specifically listed all of the items. The bill of sale clearly and unambiguously described each of the twenty items being purchased by model and VIN number, where applicable. There is no indication that Mr. Reynolds deceptively included the additional items, or that the Volners were mistaken as to which items were included. There is also nothing in the record to indicate that the Volners did not see the list, or that the items were not listed when they signed the bill of sale. We must interpret the contract as it was written, and the contract clearly

demonstrates the Volners' intent to purchase all of the equipment. Therefore, the contract is not avoidable on the basis of lack of intent and/or mutual assent.

## B. Statute of Frauds

The trial court described its second basis for setting aside the sale as follows: "Two, further the Court finds that the transaction violated the statute of frauds, in addition to the testimony that the bill of sale was fraudulently signed by the witnesses and the Notary who did not witness William Reynolds, Jr. sign the instrument." Whether a memorandum is sufficient to satisfy the statute of frauds is a question of law. *Blair v. Brownson*, 197 S.W.3d 681, 683 (Tenn. 2006).

Tenn. Code Ann. § 47-2-201 (2001) governs the statute of frauds requirement for this transaction, and it provides, in part:

> (1) Except as otherwise provided in this section, a contract for sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing or record sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing or record is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing or record.

In this case, the bill of sale is a writing or record sufficient to indicate that a contract for sale was made between the parties. In addition, all three parties participating in the transaction signed the bill of sale, although only the signature of Mr. Reynolds was required in order for the bill of sale to be enforceable against him. The trial court did not specify its reasoning as to why it found that the bill of sale did not satisfy the statute of frauds. The bill of sale only stated that the equipment was conveyed "for value received," and it did not state the exact consideration that was received by Mr. Volner. Still, the statute makes clear that the writing is not insufficient merely because it omits a term agreed upon. *See* Tenn. Code Ann. § 47-2-201(a) (2001). Also, the "Comments to Official Text" listed after the statute reiterate that the "*price*, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted." Tenn. Code Ann. § 47-2-201, cmt. 1 (2001) (emphasis added). *See also* **Cobble v. Langford**, 190 Tenn. 385, 393-94, 230 S.W.2d 194,197-98 (Tenn. 1950) (memorandum satisfied statute of frauds even though it did not contain the consideration to be paid; parol evidence of the consideration could be admitted).

The trial court did note its finding that the notary and the two witnesses who signed the bill of sale had "fraudulently signed" the document because they did not actually witness Mr. Reynolds sign his name. Each of the witnesses apparently relied upon Mr. Reynolds's assurances that he had

signed the document. Nevertheless, we are unaware of any requirement, in the statute of frauds or otherwise, that a bill of sale must be signed by witnesses or notarized in order to be enforceable.

We find that the bill of sale executed by the parties is a sufficient writing to satisfy the statute of frauds.

### C.   Undue Influence

Regarding the trial court's third reason for setting aside the sale, the judge stated: "Three, due to the unrefuted proof of the medical condition and medication of the deceased that such a transaction would violate the fiduciary relationship by a close friend purchasing $79,550 of equipment from a dying friend for $20,000, 11 days before he died." This statement reflects an apparent finding of undue influence in the transaction.

"The doctrine of undue influence applies when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship." *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). However, only *undue* influence is prohibited. *Id.* An abuse of confidence and an exercise of domination and influence must be shown. *Id.* Undue influence consists of exerting enough influence or pressure to break down a person's will power and to overcome a person's free agency or free will so that the person is unable to keep from doing what he or she would not otherwise have done. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 301 (Tenn. Ct. App. 2001) (citing *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App.1993); *Hollis v. Thomas*, 42 Tenn.App. 407, 423, 303 S.W.2d 751, 758 (1957)).

A grantor seeking to rescind a conveyance based on undue influence has the burden of proving (1) that a confidential relationship existed between the parties wherein the grantee was the dominant party, and (2) that the transaction conferred a benefit on the grantee. *Estate of Fisher ex rel. Meyers v. Rogers*, No. W2001-02506-COA-R3-CV, 2002 WL 31895721, at *2 (Tenn. Ct. App. Dec. 31, 2002). If the grantor establishes these elements, a presumption arises that the conveyance was procured through undue influence, and the burden then shifts to the grantee to prove, by clear and convincing evidence, that the transaction was fair and not the product of undue influence. *Id.*

There are two types of confidential relationships – "legal confidential relationships" and "family and other relationships." *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006) (citing *Matlock v. Simpson*, 902 S.W.2d 384, 385-86 (Tenn. 1995)). A "legal confidential relationship" is a fiduciary or other relationship where the law prohibits gifts or dealings between the parties. *Id.* at 302-303. These fiduciary relationships are confidential *per se* because of the legal

status of the parties, such as attorneys and clients.[3] *Id.* at 303. "Family and other relationships" are not confidential *per se*, and "contestants must prove the elements of domination and control in order to establish the existence of a confidential relationship." *Id.*

A friendship is not the same as a confidential relationship. 21 Steven W. Feldman, *Tennessee Practice Series – Contract Law and Practice* § 6:15 (2006). Even relationships as inherently confidential as those between family members require proof of the elements of domination and control. *In re Estate of Brevard*, 213 S.W.3d at 304. A confidential relationship in this context is not merely a relationship of mutual trust and confidence, but rather a relationship in which confidence is placed in one who is the dominant personality in the relationship, with the ability, because of that confidence, to exercise dominion and control over the weaker or dominated party. *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973).

> [T]here must be a showing that there were present the elements of dominion and control by the stronger over the weaker, or there must be a showing of senility or physical and mental deterioration of the donor or that fraud or duress was involved, or other conditions *which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor*.

*Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977) (emphasis added). Evidence of one party's deteriorated mental or physical condition will substantiate the existence of a confidential relationship if the condition renders the weaker party unable to guard against the dominant party's imposition or undue influence. *Williamson v. Upchurch*, 768 S.W.2d 265, 270 (Tenn. Ct. App. 1988). Still, "[t]he core definition of a confidential relationship requires proof of dominion and control," and the question of whether undue influence existed should be decided by the application of sound principles and good sense to the facts of each case. *Childress v. Currie*, 74 S.W.3d 324, 329 (Tenn. 2002). In undue influence cases, the question for us "is not whether the weaker party's decision was a good one, or even whether he knew what he was doing at the time." *Williamson v. Upchurch*, 768 S.W.2d at 270. Instead, we must determine "whether the weaker party's decision was a free and independent one or whether it was induced by the dominant party." *Id.*

The issue of whether a confidential relationship arose from a non-fiduciary relationship is a question of fact, *In re Estate of Brevard*, 213 S.W.3d at 303, and therefore the trial court's finding on this issue is entitled to a presumption of correctness. However, we find that the evidence does preponderate against the trial court's finding that a confidential relationship, in the legal sense, existed that allowed Mr. Volner to dominate and control Mr. Reynolds. Even though the two men were close friends and Mr. Reynolds's health was deteriorating, he did not depend on Mr. Volner

---

[3] Proof of a fiduciary relationship establishes the existence of a confidential relationship, but it does not make out a *prima facie* claim of undue influence unless the contestant establishes an additional suspicious circumstance. *In re Estate of Brevard*, 213 S.W.3d at 303.

-10-

in any way that would have given Mr. Volner "domination and control" over Mr. Reynolds's decisions. Mr. Volner had apparently driven Mr. Reynolds to their chelation treatments for years, but Mr. Reynolds had another person to drive him around generally when he became unable to drive himself. Mrs. Reynolds testified that her husband was a "sharp man," who "took care of business wise and everyone [knew] that." She also stated that he had normal discussions up until the night that he died, and that "he knew what he was doing. . . . And he done it well." There is nothing in the record to suggest that Mr. Reynolds was susceptible to domination because of his illness, or that Mr. Volner did in fact unduly influence Mr. Reynolds to sell him the equipment. To the contrary, the evidence suggests that Mr. Reynolds's decision to sell the equipment was free and voluntary, and that Mr. Reynolds actually persuaded Mr. Volner to agree to the sale. The trial judge implicitly recognized that Mr. Reynolds insisted on the transaction by finding that the sale "was an attempt to grant a dying man's wish that his business remain intact" and that Mr. Volner did not originally intend to purchase all of the equipment. The question for us is not whether Mr. Reynolds's decision was prudent, but whether it was his own decision. We find that the Administrator did not carry his burden of proving a confidential relationship or undue influence in the transaction.

### D. *Competency to Contract*

According to the trial court's order, the court also found that "the decedent had been diagnosed with terminal cancer and was prescribed morphine; that during the eleven days prior to his death the medication would impair his ability to contract." The degree of mental capacity required for one to enter a contract is a question of law. ***Rawlings v. John Hancock Mut. Life Ins. Co.***, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001) (citing *Nashville, Chattanooga & St. Louis R.R. v. Brundige*, 114 Tenn. 31, 34, 84 S.W. 805, 805 (1905)). The party seeking to rescind a conveyance because of mental incapacity has the burden of proof. ***Id.***

In ***Rawlings***, the Middle Section of this Court summarized the degree of mental capacity required to contract:

> Competency to contract does not require an ability to act with judgment and discretion. *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991). All that is required is that the contracting party reasonably knew and understood the nature, extent, character, and effect of the transaction. *Mays v. Prewett*, 98 Tenn. 474, 478, 40 S.W. 483, 484-85 (1897); *In re Estate of Holmes*, No. 02A01-9707-PB-00158, 1998 WL 134333, at *3 (Tenn. Ct. App. Mar. 26, 1998) (No Tenn. R.App. P. 11 application filed); *Roberts v. Roberts*, 827 S.W.2d 788, 791-92 (Tenn. Ct. App. 1991). Thus, persons will be excused from their contractual obligations on the ground of incompetency only when (1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) when they are unable to act in a reasonable manner in relation to

-11-

the transaction, and the other party has reason to know of their condition. RESTATEMENT (SECOND) OF CONTRACTS § 15(1) (1981).

All adults are presumed to be competent enough to enter into contracts. *Uckele v. Jewett*, 642 A.2d 119, 122 (D.C. 1994); *Foltz v. Wert*, 103 Ind. 404, 2 N.E. 950, 953 (Ind. 1885). Accordingly, persons seeking to invalidate a contract for mental incapacity have the burden of proving that one or both of the contracting parties were mentally incompetent when the contract was formed. *Knight v. Lancaster*, 988 S.W.2d 172, 177-78 (Tenn. Ct. App. 1998); *Williamson v. Upchurch*, 768 S.W.2d 265, 269 (Tenn. Ct. App. 1988). It is not enough to prove that a person was depressed or had senile dementia. To prove mental incapacity, the person with the burden of proof must establish, in light of all the surrounding facts and circumstances, that the cognitive impairment or disease rendered the contracting party incompetent to engage in the transaction at issue according to the standards set forth above. *Butler v. Harrison*, 578 A.2d 1098, 1101 (D.C. 1990); *Weakley v. Weakley*, 355 Mo. 882, 198 S.W.2d 699, 702-03 (Mo. 1947); *see also Woods v. Mutual of Omaha*, No. 02A01-9510-CV-00218, 1996 WL 578489, at *3 (Tenn. Ct. App. Oct. 9, 1996), perm. app. denied (Tenn. 1997) (rejecting an affidavit that did not address the party's competency regarding the specific contract at issue).

78 S.W.3d at 297 (footnotes omitted).

The burden of proving that Mr. Reynolds was mentally incompetent to contract on September 7, 2004, when he executed the bill of sale, rests with the Administrator of his estate. We find that the Administrator has not carried his burden. We begin by noting that there is no medical evidence in the record to prove that Mr. Reynolds did not reasonably know and understand the nature, extent, character, and effect of the transaction. The only testimony suggesting that Mr. Reynolds was ever incompetent came from Mr. Reynolds's son, former stepdaughter, and former co-worker. Randal Reynolds testified that in the last days of Mr. Reynolds's life, his physical condition was very poor, that he could hardly keep his attention, that he could hardly hear, and that he would fall asleep while people were talking to him. He concluded by saying that sometimes he could carry on conversations, and sometimes he could not, because some days were better than other days. Mr. Reynolds's former stepdaughter testified that most of the time when she would stay with him, Mr. Reynolds would not understand what she was saying, but that he was "in and out." She said that he became so heavily medicated that sometimes he might not understand her, but other times she thought he did. Also, she said that sometimes when she visited he might know her, but another time he might not. The co-worker was simply asked whether Mr. Reynolds seemed to be in his "right mind" when he went to see him before he died, to which the co-worker responded "no."

Mr. Reynolds's wife testified that sometimes Mr. Reynolds would refuse to take his medicine because he wanted to talk to people. She said that her husband was "very sharp" and "business wise," and that people were able to have conversations with him "up until the day he died, the night he died and he spoke just as plain as me and you are speaking." She conceded that he had times and bouts when he was "out of his head," but she insisted that Mr. Reynolds was not crazy and that he knew what he was doing.

Regarding the specific transaction at issue, all of the testimony at trial was to the effect that Mr. Reynolds provided the previously prepared bill of sale specifically listing all of his equipment by model and VIN number. He also provided Mr. Volner with a "stack of titles" for the equipment. Mr. Volner testified that he began discussing the sale with Mr. Reynolds several months before the sale took place. Tommy Estep, a mutual friend of both Mr. Reynolds and Mr. Volner, testified that Mr. Reynolds "had all his marbles" and was talking and "cutting up" as he normally would when the bill of sale was executed. Mr. Estep signed the bill of sale as a witness, and he also said that he had several previous discussions with Mr. Reynolds about his plans to sell the equipment to Mr. Volner and his reasons for doing so. Johnny Wilson, who was also a friend of both parties for several years, testified that Mr. Reynolds was pale but alert that day, and that Mr. Reynolds had asked him to sign as a witness for an equipment sale. David Harrison, another friend, also testified that he had discussed the sale with Mr. Reynolds. He testified that he was present on the day of the sale and heard Mr. Reynolds say that he had everything filled out, and that he just needed to get the Volners' signatures and the money.

We believe that the Administrator has failed to establish that Mr. Reynolds was mentally incompetent to contract on the day of the sale. The testimony about Mr. Reynolds having good days and bad days was not sufficient to prove that he was unable to contract on the day that he executed the bill of sale. "To prove mental incapacity, the person with the burden of proof must establish, in light of all the surrounding facts and circumstances, that the cognitive impairment or disease rendered the contracting party incompetent to engage *in the transaction at issue* according to the standards set forth above." *Rawlings*, 78 S.W.3d at 297 (emphasis added). The evidence in the record does not lead us to conclude that Mr. Reynolds was unable to understand the nature, extent, character, and effect of executing the bill of sale on September 7, 2004.

### *E.    Fraud*

As previously mentioned, the Administrator also alleged in his complaint that the equipment sale should be set aside on the bases of fraud and inadequate consideration. We will address the merit of these arguments because if the chancellor reached the correct result for the wrong reason, we may still affirm its order setting aside the sale on a proper basis. *See Allen v. Nat'l Bank of Newport*, 839 S.W.2d 763, 765 (Tenn. Ct. App. 1992).

The Administrator did not set forth any particular allegations of fraud in his complaint, but merely stated that the sale was "so foul that it reads of fraud . . . ." A conveyance can be set aside as fraudulent if it is made without a fair consideration leaving the grantor insolvent, or if it is made with the actual intent to hinder, delay, or defraud creditors. *Mid-South Bank & Trust Co. v. Paul Max Quandt Estate*, No. 01A01-9403-CH-00107, 1995 WL 614322, at *6 (Tenn. Ct. App. W.S. Oct. 20, 1995) (citing Tenn. Code Ann. §§ 66-3-101 and 66-3-305); *Macon Bank and Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986). "Because fraudulent transferors rarely disclose their intent in a way that is capable of direct evidence, persons seeking to set aside fraudulent transfers must frequently resort to circumstantial evidence." *Bell v. Goforth*, No. M2004-00997-COA-R3-CV, 2006 WL 627189, at *4 (Tenn. Ct. App. Mar. 14, 2006) (citing *McConnico v. Third Nat'l Bank*, 499 S.W.2d 874, 887 (Tenn. 1973)). The circumstances that throw sufficient suspicion on a transaction and require an explanation are termed "badges of fraud."[4] *Id.*

There is no suggestion in this case that Mr. Reynolds was rendered insolvent by the conveyance of his equipment. The Administrator estimated that Mr. Reynolds's estate consisted of approximately $200,000 in real property and $5000 in remaining personal property, and there is no evidence of any substantial debts owed by Mr. Reynolds at his death. The Administrator apparently relies upon the circumstantial evidence of events surrounding the transaction to presume that the property was conveyed with fraudulent intent.

However, "[u]nder statutes vitiating fraudulent conveyances, a conveyance in fraud of creditors can generally be assailed only by creditors," and the conveyance is valid as to all other parties. 37 C.J.S. *Fraudulent Conveyances* § 46 (2007). *See also* *Cate v. Thomas*, No. W2005-00028-COA-R3-CV, 2005 WL 3416316, at *5 (Tenn. Ct. App. 2005) (a party to a conveyance could not rely upon fraudulent conveyance statute at T.C.A. § 66-3-101 to have conveyance set aside). If a man makes a fraudulent conveyance for the purpose of defeating his creditors, the title passes between him and the fraudulent grantee, and the conveyance cannot be set aside by him or his heirs. *Copeland v. Long*, 41 S.W. 866, 872 (Tenn. Ch. App. 1896). If the transfer was good as against the decedent, it is also good as against his heirs even though it may be fraudulent as to creditors. 33 C.J.S. *Executors and Administrators* § 150 (2007). The conveyance may be voidable at the instance of hindered creditors, but it is still binding between the parties and all others. *Nichol v. Nichol*, 63 Tenn. 145 (Tenn. 1874).

---

[4] Some "badges of fraud" that Tennessee Courts have identified as helpful in determining a debtor's intent in fraudulent conveyance cases include: his precarious financial condition; his knowledge that a large money judgment would soon be rendered against him; his receipt of a life estate in the property transferred; inadequate consideration for the transfer; secrecy or haste in carrying out the transfer; a friendship with the transferee; whether the transfer included all of the transferor's nonexempt property; and a lack of an explanation or innocent purpose for the suspicious transaction. *In re Hicks*, 176 B.R. 466, 470 (Bankr. W.D. Tenn. 1995).

Similarly, an "executor or administrator takes the title of the testator or intestate and stands as his representative." 2 Jack W. Robinson, Sr. & Jeff Mobley, *Pritchard on Wills and Administration of Estates* § 691 (5th ed. 1994). An administrator ordinarily cannot impeach for fraud any conveyance which the decedent made in his lifetime of either real or personal property, for if the conveyance was good as against the decedent, it is equally good as against his personal representative.[5] *Id.* "If upon the facts disclosed the intestate could have had no recovery, his administrator who represents him can have none." *Id.* In other words, the "administrator stands upon no higher ground than his intestate," and if the deceased, if living, could not have maintained the suit, neither can the administrator. ***Henson v. Henson***, 151 Tenn. 137, 268 S.W.378, 381 (Tenn. 1925).

An administrator cannot be permitted to allege that a sale originated in the fraudulent purpose of the intestate in order to set aside a conveyance. ***Moody v. Fry***, 22 Tenn. (3 Hum.) 567 (Tenn. 1842). Courts will leave the parties to a fraudulent conveyance where they have placed themselves, and will refuse all affirmative aid to either of the parties. ***McCallie v. McCallie***, 719 S.W.2d 150, 153 (Tenn. Ct. App. 1986). "There being no intervening rights of creditors, the [conveyance is] good as between the parties and their privies." *Id.* (quoting *Thomas v. Hedges*, 27 Tenn. App. 585, 183 S.W.2d 14 (1945)). Furthermore, the fact that both parties are alleged to have participated in the fraud does not help the complainant, because where parties are equally in the wrong, the condition of the defendants is the stronger. *Id.*

In sum, even if Mr. Reynolds did act with fraudulent intent, the Administrator could not challenge the transaction as a fraudulent conveyance intended to defeat creditors. The Administrator represents Mr. Reynolds, and he cannot allege that the equipment sale originated in the fraudulent purposes of Mr. Reynolds. The Administrator could assert any other theories to set aside the conveyance that would have been open to Mr. Reynolds, such as arguing that the conveyance was procured solely by the fraud and imposition of Mr. Volner. *See Pritchard*, § 691. The common law action for fraud has been stated as follows:

> When a party intentionally misrepresents a material fact or produces a false impression in order to mislead another or to obtain an undue advantage over him, there is a positive fraud. The representation must have been made with knowledge of its falsity and with a fraudulent intent. The representation must have been to an existing fact which is material and the plaintiff must have reasonably relied upon that misrepresentation to his injury.

---

[5] In the past, a statutory exception existed that allowed an executor or administrator of an insolvent estate to bring an action to set aside a fraudulent conveyance of property. *Pritchard*, § 692 (discussing Tenn. Code Ann. § 30-5-143, repealed in 1989). The Tennessee Supreme Court had clarified, though, that the exception did not alter the "rule of the common law that the personal representative is bound by the acts of his testator or intestate, and cannot, therefore, impeach his conveyance on the ground of fraud," except in respect to insolvent estates. ***Walter v. Hartman***, 67 S.W. 476, 477 (Tenn. 1902) (citing *Boxly v. McKay*, 36 (4 Sneed) Tenn. 286 (Tenn. 1856)).

-15-

***Brown v. Birman Managed Care, Inc.***, 42 S.W.3d 62, 66-67 (Tenn. 2001) (citations omitted). The basic ingredient in a fraud claim is deception. ***Rawlings v. John Hancock Mut. Life Ins. Co.***, 78 S.W.3d 291, 301 (Tenn. Ct. App. 2001). "Fraud is a trick or artifice or other use of false information that induces a person to dispose of his or her property in a way he or she would not otherwise have done but for the fraud." ***Id.***

We have already determined that Mr. Volner did not unduly influence Mr. Reynolds's decisions regarding the transaction, and the record does not support a finding that the Volners made any false representations to induce the sale, or that they otherwise engaged in deception or had a fraudulent intent. Fraud may be properly proved by circumstantial evidence, ***Id.***, however, "[f]raud cannot be merely speculative but must be proved to a reasonable certainty as a matter of law." ***Harrogate Corp. v. Systems Sales Corp.***, 915 S.W.2d 812, 817 (Tenn. Ct. App. 1995). Here, we find that the Volners provided a sufficient explanation for the suspicious circumstances in the transaction to disprove the Administrator's allegations of fraud. Also, several witnesses testified that the decedent had told them of his plans to sell all of his equipment to Mr. Volner before he died.[6] The presumption of fraud from inequitable circumstances does not prevail where it is shown that the grantor intelligently and deliberately disposed of his property to satisfy himself. ***Stamper v. Venable***, 97 S.W. 812, 814 (Tenn. 1906). We find that the allegation of fraud in the complaint is without merit.

## F.    Adequacy of Consideration

The final argument presented in the Administrator's complaint was that the sale was not supported by adequate consideration. If Mr. Reynolds, when living, could have set aside the sale on the basis of inadequate consideration, the Administrator of his estate could do the same. However, we find that the Administrator is not entitled to such relief.

In Tennessee, all "contracts in writing signed by the party to be bound . . . are prima facie evidence of a consideration." ***Pyburn v. Bill Heard Chevrolet***, 63 S.W.3d 351, 358 (Tenn. Ct. App. 2001) (quoting Tenn. Code Ann. § 47-50-103). "The burden of overcoming this presumption of consideration in a validly executed contract is upon the party asserting a lack of consideration." ***Id.*** (citing *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn. Ct. App. 1991)). The trial court

---

[6] The dissent points out that no one knows who prepared the bill of sale listing all of the equipment. Both parties were barely able to read or write. Whoever typed the list of the equipment knew the model and VIN numbers for the various items, and some of them had never been in Mr. Volner's possession even up until the time of trial. Also, Mr. Reynolds brought a "stack of titles" for all of the equipment, and he had told various witnesses that he intended to sell all of the equipment. One witness to the transaction testified that he heard Mr. Reynolds say that he had everything filled out already, and all that he needed to do was to get the Volners' signatures and to get some money. The Volners' failure to explain this one detail of the transaction does not lead us to conclude that the transaction was fraudulent.

determined that $20,000 was paid by the Volners in consideration for the sale, and the evidence does not preponderate against the court's finding.

Inadequacy of consideration is a consideration not adequate or equal in value to the thing conveyed, and where the parties contract with knowledge of what they are doing, inadequacy of consideration is no ground for avoiding a contract. **Farrell v. Third Nat'l Bank**, 20 Tenn. App. 540, 101 S.W.2d 158, 163 (1936). Courts are not at liberty to annul or change or amend a contract entered into by parties capable of contracting simply upon the ground that the judges may be of the opinion that a better agreement would or should have been arrived at. **Matthews v. Matthews**, 24 Tenn. App. 580, 148 S.W.2d 3, 13 (1940).

In **Estate of Fisher ex rel. Meyers v. Rogers**, No. W2001-02506-COA-R3-CV, 2002 WL 31895721, at *1 (Tenn. Ct. App. Dec. 31, 2002), we addressed a situation similar to the one in this case, in which the executor of an estate attempted to set aside a deed executed by the decedent before his death. After rejecting the executor's allegations of fraud and undue influence, we discussed whether the consideration for the conveyance was inadequate:

> On the issue of adequacy of consideration, our Supreme Court has held:
>
> > [w]hile there are some cases which hold that inadequacy may be so gross, unexplained or coupled with facts inequitable in character (*Stephens v. Ozbourne*, 64 S.W. 902 [(Tenn. 1901)]), as to raise the presumption of fraud, so as to avoid the instrument, this presumption of fraud will never prevail where it is clearly shown that the grantor intelligently and deliberately disposes of his property in a manner to satisfy himself.
>
> *Stamper v. Venable*, 97 S.W. 812, 814 (Tenn. 1906). The Court, in *Stamper*, went on to state that "[w]henever it appears that the parties have knowingly and deliberately fixed upon any price, however great or however small, there is no occasion nor reason for interference by courts." *Id.* at 814-15 (citations omitted). Further,
>
> > [i]f there is nothing but mere inadequacy of price, the case must be extreme in order to call for the interposition of equity. Where the inadequacy does not thus stand alone, but is accompanied by other inequitable incidents, the relief is much more readily granted .... When the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, oppression on

the part of one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other, these circumstances combined with inadequacy of price may easily induce a Court to grant relief defensive or affirmative.

*Stephens*, 64 S.W. at 576 (citations omitted).

*Id.* at \*5. In *Estate of Fisher*, we concluded that the deed should not be set aside, even though the consideration was less than ten dollars, because there was no indication that the decedent did not intelligently and deliberately dispose of his property. There was evidence that the decedent read through the deed and understood its effect, and that the parties knowingly fixed the price. *Id.* As such, we refused to set aside the deed that reflected the parties' intentions. *Id.*

Likewise, in the case at bar, we find that Mr. Reynolds and Mr. Volner knowingly entered into this transaction, and that Mr. Reynolds voluntarily conveyed his property in a manner to satisfy himself. It would be difficult to second guess the decedent's decision to accept the $20,000 that his friend could pay by judging the benefit (or lack thereof) that we believe he derived from the bargain. Whether it enabled him to pay off debts before he died, or just gave him the satisfaction of knowing that his equipment would remain together, for whatever reason, the decedent voluntarily accepted the terms and executed the contract. As the Court noted in *Stamper v. Venable*, 117 Tenn. 557, 97 S.W. 812, 814 (Tenn. 1906), "[w]henever it appears that the parties have knowingly and deliberately fixed upon any price, however great or however small, there is no occasion nor reason for interference by courts; for owners have a right to sell property for what they please, and buyers have a right to pay what they please." The appellant's final argument is also without merit.

## V. CONCLUSION

For the aforementioned reasons, we find no basis for setting aside the bill of sale executed by Mr. Reynolds and the Volners. We reverse the decision of the chancery court, and we vacate the order setting aside the sale, ordering the estate to repay $20,000 to the Volners, and ordering the Volners to return the equipment to the estate. Costs of this appeal are taxed to Appellant, Randal Reynolds, Administrator of the estate, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE